GROSFIELD, Respondent, *v.* JOHNSON, Appellant.

(No. 7,302.)

(Submitted December 7, 1934.   Decided   January   2,   1935.)

[39 Pac. (2d) 660.]

*Messrs. McFarlane & Blenkner,* for Appellant, submitted a brief; *Mr. E. A. Blenkner* argued the cause orally.

*Mr. Charles W. Campbell,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

The plaintiff, A. M. Grosfield (respondent), commenced this action in the district court of Sweet Grass county to enjoin the defendant (appellant), Jacob Johnson, from trespassing upon plaintiff's land, and from removing an old fence and building a new fence near the dividing line between the premises of the respective parties.

Plaintiff is the owner of Sec. 5, Tp. 2 N., R. 13 E., Sweet Grass county. The defendant is the owner of adjoining lands in section 6. For a period of about seventeen years immediately prior to August 5, 1932, there was a fence extending north and south near or upon the line between the two sections. Plaintiff contends that this old fence marked the true boundary line, but defendant claims that the boundary line was at a point beginning at the south end thereof, 107 feet east of the old fence. In accordance with the latter contention, defendant did on August 5, 1932, begin to tear down the old fence along a line several feet east of the old fence. On August 6, plaintiff

demanded of defendant that he cease such operations. Defendant disregarded the demand and proceeded to change the location of the fence. Thereupon plaintiff instituted this action to obtain an order of the district court to restrain the removal operations, to require defendant to remove such new fence as he had already built on plaintiff's land, to rebuild such line fence on the proper boundary line as claimed by plaintiff, and to restrain defendant from trespassing upon plaintiff's land.

A temporary restraining order and an order to show cause were issued and served. Defendant filed an answer wherein he alleged that the new fence had been completed before the service of the restraining order. He denied that the old fence was on the true boundary line, and alleged that the new fence was on the proper boundary line between the two sections. He further alleged that in 1926 plaintiff had agreed with him that the old fence was not on the boundary line, and had agreed to move the same over to the proper position himself; that plaintiff had failed to move the fence as he had agreed to do; that in 1931 plaintiff had informed him that he would not move the fence until there was a proper survey and location of the actual boundary line; that he, defendant, had caused a survey thereof to be made, and even then plaintiff had failed and refused to move the fence to the line shown by the survey to be the true line.

Plaintiff filed a reply in which he denied the essential allegations of defendant's answer, particularly that he had ever agreed that the old fence was not upon the true boundary line, or that he would move the fence.

The cause was tried by the court without a jury. Evidence was submitted on behalf of both parties. At the close of the testimony the judge went upon the premises and viewed the same for the purpose of a better understanding of the contentions involved in the controversy. Thereafter the matter was submitted to the court upon briefs, and findings of fact and conclusions of law offered by both parties. The court found generally in favor of plaintiff, and entered judgment accordingly. Hence the appeal by defendant.

The court in its findings of fact fixed and determined what it declared to be the true boundary line between the two tracts. This line, on the west boundary of section 5 and on the east boundary of section 6 at the quarter corner common to the two sections, was fixed at a government monument declared by the court to be the true corner established in place by the United States government survey.

The court found that, for about seventeen years immediately prior to August 5, 1932, there was a substantial boundary line fence on the true boundary line between the land belonging to the plaintiff in section 5, and the northeast quarter of the southeast quarter of section 6, belonging to the defendant; that for a period of at least fifteen years immediately prior to that date there was a substantial fence running in a northerly direction over the true quarter-section corner between sections 5 and 6, and on the same course as the boundary fence south of that quarter-section corner, to the foot of a steep hill something less than a quarter of a mile from the quarter-section corner; that from that point the fence veered to the northeast up a hill to the brow thereof, and to a point which was on the true line between the southeast and the northeast corners of section 6; and that from that point the fence ran on a true line to the northeast corner of section 6.

It will be observed that, while the court found most of the old fence on the proper line, it found a deviation therefrom at the point indicated; and further that, as a result of such deviation, 1.44 acres of defendant's land were fenced in with that of plaintiff's land, and .84 of an acre of plaintiff's land had been fenced in with that of defendant.

Judgment was entered in accordance with the findings of fact and conclusions of law. It ordered the reconstruction of the fence on the true boundary line as found by the court, and directed that, inasmuch as a part of the old fence between the tracts—a trifle over a quarter of a mile—had not been and was not on the true boundary line, but erected in its present location by the plaintiff, the latter should at his own proper cost and expense remove that part of the fence from

its location, and rebuild the same on the true boundary line as determined by the court; that plaintiff have a reasonable time, not to exceed sixty days, within which to make the change; and that the remaining portion of the fence should be moved to the true boundary line by the defendant, at his expense and within a reasonable time, not to exceed sixty days.

A major question presented for decision here involves the finding of the court that the government monument, known as the quarter corner on the boundary line between sections 5 and 6, was the true corner and in place.

In order to establish the line, defendant employed one C. E. Busse, a civil engineer, to make a survey. Busse obtained the original government field-notes and used them as a guide. He found all the corners of sections 5 and 6, and declared that they were all marked by government monuments in place. He did not locate to his satisfaction the monument marking the quarter corner in controversy. In explaining this matter, he said that the field-notes indicated that the monument had been located approximately halfway between the north and south boundaries of the section, and upon a direct line between the northwest corner and the southwest corner of section 5. The field-notes described the monument as being "a boulder stone 12x7x7 inches, set 8 inches in the ground with two bearing trees." Busse did find a stone marked "¼" approximately halfway between the north and south boundary, which he said was at the foot of one of the fence posts of the old fence. It was not, however, in a direct line between the two section corners as described in the field-notes. It was 107 feet west of the halfway point upon a direct line between the two section corners. Busse said the stone which he found was a round boulder, 8x7x7, lying in a 2½-inch depression under the old fence. He testified that, contrary to the description in the field-notes, there was no evidence of bearing trees at that point. Because of the discrepancy in size, the lack of the bearing objects, and the other conditions found by him on the ground, he concluded that the stone was not

the government monument in place. Thereupon he undertook to establish the quarter corner himself, and did so on a direct line between the northwest and the southwest corners of section 5, and at a point midway between these corners. He claims that he made this location in accordance with the Manual of Instructions given to surveyors for the survey of public land. He was emphatic in his declaration that the stone found was not the true government monument in place.

Osmund Larson, a witness for defendant, testified that several years previously he had seen the monument stone in place at a point 10 feet east and 80 feet north of the point at which the court found it was placed by the government surveyor. Defendant also produced other evidence tending to show that the stone in its present location did not correspond with the description in the government field-notes.

Plaintiff produced two qualified civil engineers who testified as to the survey generally and the quarter corner in particular. The witness Wolvard was a surveyor who had been employed by plaintiff to make a survey, and he testified as to the results of that survey. He said he used the field-notes, and by reference to them he retraced several of the section lines in that vicinity, as well as the lines and points particularly in controversy, and that, in measuring from the southwest corner of section 5 to the point where the quarter stone is now located, he found only a slight variation from the field-notes. In attempting, however, to run a line from that corner to the northwest quarter of section 5, he found a considerable variation from the field-notes. He said he found this to be true, not only with respect to this line, but also with respect to several similar lines in adjoining sections. Because of this, he concluded that the government surveyor in establishing the quarter corner had never actually gone beyond the point where he established such corner, in spite of the fact that the field-notes indicated that he did continue to the northwest corner of the section. This conclusion was corroborated by the testimony of the witness McLeod, who was at one time a government surveyor himself. Wolvard did not find the

bearing trees described in the notes, but he did find some tree roots at that point. He pointed out that such trees as were described in the field-notes were short lived, and that they had probably died since the survey was made. This witness was emphatic in declaring that the quarter corner was in place, and that it conformed exactly to the position indicated in the field-notes, on the line between the southwest corner of section. 5 and the stone in place. He did not attach any particular importance to the variation in the size or contour of the stone. He explained the location of the stone in relation to Swamp Creek, a near-by stream, and accounted for the difference in the distance from Swamp Creek, as shown by the field-notes, and the actual measurement, by the fact that the channel of the stream had been changed by erosion and washing, and that Swamp Creek had gradually moved to the north, so that it had thrown the field-notes out of proportion in that particular.

Defendant introduced evidence tending to show that the change in the course of the stream was in the direction opposite to that asserted by plaintiff's witness.

Both Wolvard and McLeod, testifying as experienced surveyors, gave their unqualified opinion that the stone found in place, as declared by the court to be the government monument, was in place as established by the government surveyor.

Plaintiff in his own behalf, and one other witness, testified that they had seen the stone in its present location many years ago, and that it had been there ever since. Witnesses Berland and Hauge testified that they had built the old fence— the one torn down by defendant; that at the time of its erection the stone was in place at its present point of location, and that they built the fence over it at the dividing line on the quarter corner between sections 5 and 6. It appears that, at the time these men built the fence, they were proving up on homesteads taken in section 6, and that, if the stone had been located farther east—as defendant now contends—it

would have been to their interest to have located the fence farther to the east.

There is a direct conflict in the evidence as to whether the plaintiff ever agreed that the old fence was not upon the boundary line, and that he himself would move it farther to the east to correct the line. The court evidently found that he had never made such an agreement.

Although both sides adduced some other evidence on the points involved, it is not necessary to recount it here. The foregoing is sufficient to serve as a statement of the case and a synopsis of the testimony.

The court found that the quarter corner stone identified by surveyors Wolvard and McLeod was the government monument in place as established by the government surveyor, marking the quarter corner between sections 5 and 6; that the old fence was partly upon the true boundary line as hereinbefore indicated; that the defendant had no right to enter upon plaintiff's land to tear down the old fence and to erect a new one; that the defendant had the new fence practically completed when served with the temporary restraining order, and immediately thereafter did entirely complete it, and thus deprived the plaintiff of the use of that portion of his land in section 5 so segregated by the line of the new fence.

Appellant makes three specifications of error. We think, however, that there are but two major questions involved in this appeal. The first one has to do with the finding of the court that the quarter corner between the two sections was found in place, and the other has to do with the extent of the judgment and the orders that the respective parties move the line fence to the true boundary line as found and declared by the court.

It is not necessary again to detail the evidence respecting the finding of the court relative to the quarter corner monument on the line between the two sections. The court found that this monument was in place as established by the original survey. It is correctly conceded by all concerned that the burden of establishing this fact by a preponderance

of the evidence rested upon the plaintiff. The only question for our consideration, then, is, Did the testimony satisfy such requirement? If there was sufficient evidence upon which the court could base such a finding, we must sustain it. In the recent case of *Nemitz* v. *Reckards*, ante, p. 229, 38 Pac. (2d) 980, this court had before it a case involving a similar question. There the issue also involved a quarter corner monument, and there was conflicting evidence on the subject. The trial court found that the quarter corner was in place, and that finding was challenged. In passing upon the question it was said: "This court has repeatedly recognized the rule that the findings of fact made by the trial court will not be overthrown unless there is a decided preponderance of the evidence against them, and that they will not be disturbed when the evidence discloses reasonable grounds for different conclusions." Authorities were cited to support this statement.

In the instant case, as will be observed from the foregoing █ statement, there is an apparent and sharp conflict in the evidence relative to the quarter corner. It is equally apparent, however, that there is substantial evidence in the record to support the finding of the district court in this respect. The situation here is almost the same as that existing in the *Nemitz* v. *Reckards Case,* supra. In that case the district judge, after hearing the evidence, proceeded to the premises and personally viewed the situation on the ground. The judge did the same in this case. What we said in the *Nemitz* v. *Reckards, Case,* supra, is applicable here, viz.: "A view of the premises made by the trial judge must be presumed as equivalent to an examination by a jury. Whenever a jury has viewed premises for a better understanding of the testimony of witnesses, the determination of the fact in issue, when supported by some evidence, as here, will not be disturbed on appeal"—citing *State* v. *Anderson,* 92 Mont. 313, 13 Pac. (2d) 228.

The court had to decide the question. It had to find in favor of one contention and against the other. It did find in

favor of the plaintiff, and thereby adopted his views and the contentions of his witnesses.

We hold that there was sufficient evidence to sustain the court's finding that the monument marking the quarter corner in question was in place as contended for by plaintiff and found by the court.

Defendant complains that it is impossible to ascertain, from ██ the amended complaint, the nature of the action he was called upon to defend. In this connection he argues that, while the action appears to be one to enjoin him from moving and rebuilding the fence, the fact is, as shown by the evidence, that he had completed moving and rebuilding the fence before the action was commenced. As we have already pointed out, the evidence upon this question was in conflict. The court specifically found that the new fence was not fully completed before the action was commenced and process served on defendant. There was sufficient evidence to sustain that finding.

Section 9240, Revised Codes 1921, defines an "injunction" as an order requiring a person to refrain from a particular act. It makes no particular provision for an order commanding affirmative acts to be done. Because of this the defendant argues that an injunctive order could not · properly issue against him, since he cannot refrain from doing an act which he has already done. In other words, he contends that, since the statute makes no provision for an injunctive order of a mandatory nature, no such order can be granted.

The California statute (sec. 525, Code Civ. Proc.), defining an injunction order, is practically identical with our statute, section 9240, supra. Reference is made to the California statute in 14 Cal. Jur. 177, where it is said: "The Code definition of an injunction omits the mandatory ingredient, and there is said to be nothing in the Code more favorable to such injunction than is to be found in the general current of English and American authority. The principles upon which mandatory and prohibitory injunctions are granted do not materially differ. The courts are perhaps more reluctant

to interpose the mandatory writ, but in a proper case it is never denied"—citing *Gardner* v. *Stroever,* 81 Cal. 148, 22 Pac. 483, 6 L. R. A. 90; *Allen* v. *Stowell,* 145 Cal. 666, 79 Pac. 371, 104 Am. St. Rep. 80, 68 L. R. A. 223. Accordingly, the California courts have held that mandatory injunctions are properly employed in cases of nuisances, or continuing trespasses of an irreparable nature. (*Taft* v. *Washington,* 29 Cal. App. 197, 154 Pac. 1073; *Haynes* v. *Indio Levee District,* 46 Cal. App. 436, 189 Pac. 475; 14 Cal. Jur. 178, and cases cited.)

In 32 C. J. 23, it is stated as a general rule that: "Equity not only has jurisdiction in a proper case to compel affirmative performance of an act as well as to restrain it, but that it is its duty to do so. A mandatory injunction may be granted, although the act causing the injury has been completed before the suit is brought. The complainant may by this means be put *in statu quo*"—citing numerous authorities from practically every state in the Union. The same rule is recognized and stated as being established by the weight of authority everywhere, in practically every text treating the subject of injunctions. (See 1 Joyce on Injunctions, 174; 14 R. C. L. 315 et seq.) Mandatory injunctions have frequently been employed in cases dealing with irrigation and water rights. All the texts upon the subject of water rights recognize the propriety of issuing such an injunction when a proper case is presented therefor. (See 3 McKinney on Irrigation and Water Rights, 2928.)

This court has recognized the fact that mandatory injunctions may be granted in certain cases. In *Wilhite* v. *Billings etc. Power Co.,* 39 Mont. 1, 101 Pac. 168, 171, it was said: "This court will in proper cases order the entry of interlocutory restraining orders, either mandatory or prohibitory." (See, also, *Babcock* v. *Gregg,* 55 Mont. 317, 178 Pac. 284.)

The plaintiff in this action has presented a proper case for an order of a mandatory nature. Thus, under the foregoing authorities, there is no merit in defendant's complaint concerning the judgment which was entered against him.

Defendant further complains that he is required by the ██ judgment to rebuild a part of the fence upon the line, and that a part of such fence so required to be rebuilt has never actually been upon the boundary line as found by the court.

With rare exception, the mandatory form will not be decreed for other purposes than to restore and maintain a condition which has been wrongfully changed (Davis & Spilling on Injunction, sec. 22), but the early restrictions on this form of injunction have given way to a more liberal construction of the court's power (*Hill* v. *Brown,* (Tex. Civ. App.) 225 S. W. 780), and courts may relax the rules in order to attain the ends of justice (Davis & Spilling, supra, sec. 23). A court of equity, having obtained jurisdiction of the cause for the purpose of injunction, may decide the whole controversy and render a final decree, even though all the issues are legal in their nature, capable of being tried in a court of law, and the legal remedies are adequate. (1 Pomeroy's Equity Jurisprudence, 4th ed., 367; see, also, 5 Pomeroy's Equity Jurisprudence, 2d ed., sec. 1924.)

Therefore, while the law applicable to line fences would be adequate to compel the construction of a fence on the proper line, the court, having obtained jurisdiction, was justified in disposing of the entire controversy and thus save the parties further trouble and expense. The rule laid down in the following cases warrants such action: *Compton Hill Imp. Co.* v. *Strauch,* 162 Mo. App. 76, 141 S. W. 1159; *Codman* v. *Bradley,* 201 Mass. 361, 87 N. E. 591; *State ex rel.* v. *Dayton & S. E. R. Co.,* 36 Ohio St. 434; *Bussier* v. *Weekey,* 11 Pa. Super. 463.

As the plaintiff is not complaining with respect to the like order against him, we do not pass on the question as to whether in such a case the court may by mandatory injunction compel a plaintiff to construct his portion of a division fence.

By virtue of the above rule "a court of equity will, when its jurisdiction has been invoked for an equitable purpose,

proceed to determine any other equities existing between the parties connected with the main subject of the suit, and grant all relief necessary to an entire adjustment of such subject." (21 C. J. 137; *Meredith* v. *Roman,* 49 Mont. 204, 141 Pac. 643; *McConnell* v. *Combination M. & M. Co.,* 30 Mont. 239, 76 Pac. 194, 104 Am. St. Rep. 703.)

Under these rules it is manifest that the trial court acted within its power and jurisdiction. It sought to adjust all the questions arising out of the subject involved in this suit. It was for the accomplishment of that end that the court ordered that the plaintiff himself remove and rebuild certain portions of the fence.

The attention of the district court is directed to the fact that weather conditions may preclude the possibility of building the fences in the winter season, and therefore may make it necessary for the court to fix some reasonable time for the accomplishment of the acts commanded by the decree without imposing undue hardship upon the parties.

No error appearing in the record, the judgment is affirmed.

Mr. Chief Justice Callaway and Associate Justices Angstman, Matthews and Anderson concur.