MARYLAND TRUST COMPANY ET AL. *v.* TULIP REALTY COMPANY OF MARYLAND, INC., ET AL.

(Four Appeals In One Record)

[No. 279, September Term, 1958.]

400

*Decided July 2, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Robert C. Prem,* with whom were *Carlyle Barton, Theodore R. Dankmeyer* and *Niles, Barton, Yost & Dankmeyer* on the brief, for appellants Maryland Trust Company and Trustees.

*J. Cookman Boyd, Jr.,* with whom were *Henry M. Decker, Jr.,* and *Walter S. Levin* on the brief, for appellant American Stores Company.

*Sol C. Berenholtz,* with whom was *Solomon Kaplan* on the brief, for appellants Sedgemoor Realty Corporation, Woodmoor Realty Corporation, Ellis Myers, Paul Goodman, et al.

*Albert L. Sklar* and *Robert L. Sullivan, Jr.,* with whom were *Theodore S. Miller, Abraham L. Adler* and *Sklar & Sullivan* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

When the Circuit Court for Baltimore County ordered the erection of a five-foot wire fence between a shopping center and an adjoining lot improved by a store building which faced the parking area of the center, and released the tenant of the store building from further obligations under its lease, some of the interested parties appealed and others cross-appealed.

On January 7, 1953, the Tulip Realty Company of Maryland, Inc., (Tulip) purchased a part of the Woodmoor Shopping Center, located between Liberty Road and Marston Road with Essex Road on the westerly side and the property of the Atlantic Refining Company (Atlantic) on the easterly side. In the deed from Woodmoor Realty Corporation (Woodmoor), the Tulip property was referred to and designated on the plat attached to the deed as Parcels A, B and C. Parcel A was further designated as "Food Fair Building"; Parcel B as "Food Fair Parking Area"; and Parcel C as "Food Fair Loading [Area]." Parcel D on the plat was reserved as a "turn around" for the loading area [Parcel C]. Parcel E was the only other store area in the shopping center. Parcel F was designated as "Future Store Area," but this parcel as well as Parcel G were originally reserved as parking areas. Parcel H was reserved for a pavement and grass strip between Liberty Road and the shopping center. With the exception of the entrances, a barrier was erected along the boundary line between Parcel H and Parcels B and G.

The deed from Woodmoor to Tulip contained numerous provisions, conditions and covenants which imposed certain easements and restrictions relating to the use of the property purchased as well as to the remainder of the shopping center retained by Woodmoor. Among other restrictions, there was an exclusive right in Tulip to conduct the only food market in the center. There was also a right to use Parcels F and G as parking areas, in common with tenants of other stores on Parcel E. There were further covenants that Woodmoor would police Parcels F and G; that the areas reserved for parking would be kept clear of buildings, fences or obstructions; and that Parcel F could be eliminated as a parking area provided an area adjacent to Parcel G was substituted therefor.

There was a time [March, 1952] when Woodmoor was interested in purchasing a part of the Atlantic lot, but subsequently [July, 1953] changed its plans when it abandoned its intention to acquire the lot as parking space to be substituted for Parcel F. Thereafter [October, 1953], the stockholders of Woodmoor decided to acquire the lot through a new corporation [Sedgemoor] [1] and actually did acquire the southerly part of the Atlantic lot on June 21, 1954. On the same day, Woodmoor entered into an agreement with Atlantic that it would not erect any building or other barrier on or between the Woodmoor parking area and that part of the lot retained by Atlantic.

About a year later, on June 8, 1955, Woodmoor entered into a boundary line agreement with Sedgemoor (then incorporated) by which Woodmoor agreed (1) not to erect any building, wall or fence which would impede or prevent the free flow of pedestrian traffic across the boundary between its property and that of Sedgemoor or obstruct the visibility of such improvements as might thereafter be constructed on the Sedgemoor property; and (2) not to erect additional build-

---

1. The original stockholders of Woodmoor were Abraham Goodman and Paul Goodman, who were father and son respectively. In February of 1954 the father transferred one-half of his stock to Dorothy Nattans and the son transferred one-half of his stock to Ellis B. Meyers. Sedgemoor, which was incorporated in May of 1954, had the same stockholders as Woodmoor and substantially the same directors and officers.

ings on the Woodmoor property between those then on Parcel E and the Sedgemoor property. In the same agreement Sedgemoor agreed (1) not to erect any wall or fence on the boundary line; and (2) not to erect any store or building for the sale of food products at retail facing or fronting on Woodmoor unless it [Sedgemoor] should provide adequate parking facilities in the vicinity for the use of its tenants and their patrons and should lay a walk along the boundary line to be used as an entrance to the Sedgemoor store without the necessity of going on the Woodmoor property. Two days after the execution of this agreement—admittedly as an assurance to the American Stores Company (Acme) that the boundary line between Sedgemoor and Woodmoor would remain unobstructed—Acme agreed to lease a store to be constructed by Sedgemoor on the lot purchased from Atlantic. The store, which is now complete, or nearly so, faces or fronts on the Woodmoor parking area. However, a conveyor and pick-up system to facilitate deliveries of purchases was provided on a level with Marston Road. Sedgemoor also provided a hilltop parking lot and a flight of steps on the opposite side of Marston Road for the use of Acme patrons, but the topography thereof, shown by exhibits, indicates the presence of obvious inconveniences which may deter maximum use of the facility.

There was testimony that Sedgemoor placed its building in the only location that was feasible from an engineering and economic point of view since the beds of Marston Road and Sedgemoor Road were upgrade from the level of its property. In explaining the purpose of the provisions in the boundary agreement as to nonobstruction and the free flow of pedestrian traffic from one store or shop to another in the shopping center, it was stated that it is "a basic economic precept to have no fence between abutting properties" to the end that one store might pick up business from another's customers and vice-versa.

There was testimony by a shopping center real estate expert to the effect that the Acme store appeared to be a part of the Woodmoor shopping center and that Acme patrons would likely use the center's parking facilities because that was the spot most convenient to the Acme entrance and exit. The

expert described the Woodmoor parking area as a path of least resistance when compared with walking across Marston Road and up or down the steps to and from the inconveniently located Sedgemoor parking lot; however, he did not know what effect the Acme delivery facilities on Marston Road might have on the parking habits of patrons. But, with respect to the use of the adjacent parking area, there was testimony by another witness that it was never the plan of Acme to use Woodmoor parking facilities since only "customer" carts would be used and "parking lot" carts would not be available.

There was also testimony by the attorney for Sedgemoor and Woodmoor to the effect that Acme—because it was concerned about the possibility of a fence being erected along the common boundary line—had requested the insertion of an "option to cancel" clause in the lease for its protection, and that, although the request was refused, Acme was advised that a mutual nonobstruction agreement between Woodmoor and Sedgemoor could be had if desired. An agent, testifying on behalf of Acme, denied that it had requested an option to cancel, but stated it had demanded the execution of the boundary line agreement as a condition to, and inducement for and in consideration of its entering into the lease. It was not until such assurances had been given and approved that Acme executed the lease. There was no mention of the agreement in the lease, but both were recorded simultaneously on the land records.

On January 9, 1957, Tulip sued Sedgemoor, Woodmoor and the stockholders, directors and officers of both corporations. By its bill, Tulip sought several kinds of injunctive relief as well as compensatory and punitive damages for violations of the covenants in its deed, claiming that Sedgemoor and Woodmoor were in fact one organization and that the store building on the Sedgemoor lot was an integral part of the shopping center and was intended to be used as and for another food market in competition with the supermarket conducted on Tulip's property. Food Fair Stores, Inc., Food Fair Stores in Baltimore County, Inc., and Penn Mutual Life Insurance Company, which also had interests in the controversy, were made parties plaintiff at a later stage of the proceeding.

Acme and the trustees [Christopher A. Rupp and George W. Spurrier] and the beneficiary or mortgagee [Maryland Trust Company] under a deed of trust from Sedgemoor to secure the construction mortgage loan were also made parties defendant. Acme filed a cross-claim against Sedgemoor, the mortgagee and the trustees seeking a release and discharge from its obligations under the lease in the event it should be precluded from occupying the leased premises in accordance with the terms of the lease and the boundary line agreement between Sedgemoor and Woodmoor.

The chancellor concluded that it was unnecessary to rule on the question of whether or not the construction of the store building by Sedgemoor was a violation of Tulip's rights with respect to freedom from competition. He found, however, that the Sedgemoor building "was constructed with the purpose of utilizing the Woodmoor Shopping Center parking lot and making the Sedgemoor property an integral part of the shopping center in pursuance of a bold scheme to evade rights vested in Tulip." The initial decree directed the construction of a wall to make it impossible for Sedgemoor and Acme to utilize the Woodmoor parking facilities. Following a supplemental hearing, a modified decree directed the erection of a wire fence along the boundary line between Sedgemoor and Woodmoor and for a distance of twenty feet along the southerly boundary of the shopping center, across an existing driveway leading from the center on to Marston Road. It was further ordered that Acme be released and discharged from all obligations under its lease with Sedgemoor.

On appeal, Sedgemoor and Woodmoor, and three of the directors and officers of the corporations, and the mortgagee and trustees contend (i) that Tulip was not entitled to an injunction against the use of the Sedgemoor building as a food market; (ii) that the chancellor erred when he required the erection of the fence; and (iii) that Acme should not have been released from its obligations under the lease. Acme agrees that Tulip was not entitled to any form of injunctive relief, but contends that if such relief is proper, then it should be released and discharged from all obligations under its lease. In addition to insisting that use of Woodmoor parking facili-

ties by Acme patrons would constitute a breach of its contractual rights and that the erection of a fence was proper, Tulip contends that it was also entitled to enjoin the use of the Sedgemoor building as a food market.

(i). Use Of Sedgemoor Building As Food Market.

Although the chancellor concluded that it was unnecessary to rule on this question, the point was presented below and the cross-appeal makes it necessary for us to consider it here. However, even if we assume that the construction of the Sedgemoor building facing the Woodmoor shopping center, as and for a food market, was a scheme on the part of Sedgemoor and its tenant to evade the exclusive right Tulip had to sell food products at retail in the shopping center, it is clear that the plan was not a violation of the restrictive covenant between Woodmoor and Tulip for the reason that the application of the restrictive covenant was expressly limited to that portion of the center designated as Parcel E.

The general rule is that restrictive covenants are strictly construed so as to favor the unrestricted use of property. *Martin v. Weinberg,* 205 Md. 519, 109 A. 2d 576 (1954). Moreover, a restrictive covenant will not be extended by implication beyond the original intent of the contracting parties so as to include an area not clearly expressed in the agreement or deed of the contracting parties. *Checket-Columbia Co. v. Lipman,* 201 Md. 494, 94 A. 2d 433 (1953). And, if there is a doubt, it will be resolved in favor of an unrestricted use. *Club Manor v. Oheb Shalom Cong.,* 211 Md. 465, 128 A. 2d 405 (1957). Since the result of construing the meaning of a restrictive covenant in a deed—such as we are here concerned with—would not be different under the circumstances in this case from the construction of a similar covenant in a lease, the cases in this field particularly those in Maryland, are in point.

For instance, the situation here was not the same as it was in *Slice v. Carozza Prop., Inc.,* 215 Md. 357, 137 A. 2d 687 (1958). There, the exclusive covenant to sell alcoholic beverages was not limited to the area occupied by the original stores in the shopping center, but extended to an addition or second section thereof. Here, there is no doubt that the restricted

area was limited by the words of the deed, to "the area designated as E" on the plat attached to the deed. Nor is the situation here the same as it was in *Belvedere Hotel Co. v. Williams*, 137 Md. 665, 113 A. 335 (1921). There, the restrictive covenant in a lease, which provided that the lessee should have the exclusive right to operate a barber shop in a hotel, was violated when the hotel company leased to another barber space for a shop in an adjoining building directly connected with the hotel lobby. See also *Schmidt v. Hershey*, 154 Md. 302, 140 A. 363 (1928) [restrictive covenant not to lease "any other storeroom or any other space" in a hotel was violated when an outside storeroom in the hotel was rented to another to sell the same products]. And see *Loblaw, Inc. v. Warren Plaza, Inc.*, 163 Ohio St. 581, 127 N. E. 2d 754 (1955), where the owner of a shopping center—having leased a store therein with a proviso that the lessor would not lease another store as a food market within a radius of five hundred feet of the demised premises—built and rented a store to a competitor adjacent to the parking area but more than five hundred feet from the first tenant's store. When the first tenant sought to enjoin the use of the second tenant's store as a food market, the lower court granted injunctive relief, but the appellate court reversed on appeal.

For the reasons stated, even if we also assume that the corporate entities should be disregarded, there is no doubt that the limited area [Parcel E], in which the restrictive covenant was operative, effectively precluded Tulip from claiming injunctive relief against the use of the Sedgemoor building as a food market.

### (ii). Mandatory Injunction To Erect Fence.

That part of the chancellor's decree which required the erection of a wire fence along the boundary line between Sedgemoor and Woodmoor and for a distance of twenty feet in a westerly direction along Marston Road was proper. The chancellor, who had an opportunity to judge the credibility of the witnesses, concluded that the words and actions of some of the defendants were in direct and irreconcilable conflict, and found as a fact that Sedgemoor constructed its building with the intention of utilizing the Woodmoor parking areas

and of making its building an integral part of the shopping center. In so doing, we cannot find that the chancellor was clearly wrong. Rule 886 a. The pertinent covenant with which we are now concerned expressly provided that Tulip should have the "right, privilege and easement, * * * free and clear of all encumbrances," in common with the tenants of other stores in the shopping center, to go "over, across and above" Parcels F and G for the benefit of itself, "and its patrons and business guests for the purpose of ingress and egress * * * and for * * * use * * * as and for a parking area for * * * motor vehicles and delivery of merchandise in connection with the business to be conducted by" Tulip on Parcels A, B and C. There is no doubt that the terms of this covenant required Woodmoor to maintain the parking areas for the use of Tulip and the tenants on Parcel E in a manner compatible with full and complete use thereof by those legally entitled thereto. That this is so is pinpointed by another covenant which provided that no stores should be constructed on Parcel F until a new parking area (three times larger than F) had been provided adjacent to Parcel G. Moreover, Woodmoor demonstrated that it was fully cognizant of its contractual obligations in this regard when, by the execution of the boundary line agreement with Sedgemoor in an effort to accommodate a prospective tenant of the latter, it deliberately attempted to disregard its responsibilities by circumvention. There is also no doubt that any use of the parking areas for a purpose outside of those expressed in the covenant which would decrease the availability of the contemplated uses of Parcels F and G by Tulip and its patrons would constitute a violation of the covenant. Therefore, when the stockholders, directors and officers of Woodmoor increased the area of the shopping center by forming a new corporation to purchase the southerly part of the Atlantic lot and when that corporation [Sedgemoor] undertook to construct a store building facing or fronting on the parking areas of the center, it is clear that such acts were done with the intent to make the store building a part of the center and to evade the parking area covenant Woodmoor had made with Tulip. Despite the protestations to the contrary, it is apparent that the execution of the boundary line

agreement, with the expressed purpose of keeping the boundary line unobstructed along the perimeter of the parking areas in question, was an attempt to accomplish by indirection that which could not be done directly. Even though it may be desirable from an economic standpoint to have free access available to all stores in a shopping center, it is also an important element of shopping center economics to have available at all times sufficient parking facilities to accommodate the patrons of those who own or rent stores in the center. In its covenant with Tulip, Woodmoor agreed that the parking facilities would remain intact. We think that under the circumstances in this case the covenantor had no right to cut down the use of the parking facilities by an indirect evasion of its legal obligations to the covenantee. Having violated the parking area covenant, Woodmoor is liable for such consequences as were inevitable as a result of the breach of the parking area covenant. Whatever may have been Woodmoor's avowed motive and purpose, there is no doubt that the execution of the boundary line agreement would have the effect—unless prohibited by a decretal order—of extending to the future patrons of Sedgemoor's tenant an implied invitation to park their automobiles in the Woodmoor parking area, which only Tulip and the tenants of the shopping center and their patrons had a right to use.

The chancellor, realizing that any injunctive relief he might grant would be difficult to enforce, required the Woodmoor and Sedgemoor corporations, and such of the stockholders, directors and officers thereof over whom he had jurisdiction, to erect the fence, which is the chief bone of contention in this controversy. What he did in the exercise of his discretion was clearly not erroneous, so far as Woodmoor was concerned.

Rule 1195 a, which was not effective when the decree in this case was signed on November 13, 1958,[2] defines a mandatory or affirmative injunction as an order requiring or commanding the doing of the action specified. While it is true that a mandatory or affirmative injunction should be issued with caution, and is ordinarily restricted to cases where adequate redress

---

2. The rule did not become effective until January 1, 1959.

at law is not afforded, or where the injury is not compensable in damages, and in weighing the propriety of issuing it, a court should consider the relative convenience and inconvenience which will result to the parties from granting or refusing this form of injunctive relief [*Baltimore & Philadelphia Steamboat Co. v. Starr M. P. Church,* 149 Md. 163, 130 A. 46 (1925)], we think the issuance of a mandatory injunction under the circumstances in this case was peculiarly appropriate. Indeed it appears that the erection of a fence or a wall was the only effective remedy the court could grant since it is clear that an order to police the area would not have been feasible and would likely have resulted in a multiplicity of contempt proceedings and the necessity of imposing equity sanctions by way of a fine or incarceration. Moreover, a mandatory injunction is by no means a novel equitable remedy either in Maryland or other jurisdictions.[3]

In *Grosfield v. Johnson,* 98 Mont. 412, 39 P. 2d 660 (1935), the lower court ordered the erection of a new fence in another place. In commenting on the statutory meaning of an injunction, the appellate court stated that the principles upon which mandatory and prohibitory injunctions are granted do not materially differ, and even though courts are more reluctant to interpose the mandatory writ, nevertheless, it is never denied in a proper case. Moreover, it appears to be immaterial whether the complaint seeks prohibitive rather than preventive relief. 28 Am. Jur., *Injunctions,* § 17.

Sedgemoor, as well as those stockholders, directors and of-

3. See, for instance, *Northern C. Ry. Co. v. Canton Co.,* 104 Md. 682, 65 A. 337 (1906) [removal of railroad tracks]; *Coggins & Owens v. Carey,* 106 Md. 204, 66 A. 673 (1907) [closing of windows in party wall to make it as solid as a party wall should be]; *Steamboat Co. v. Starr M. P. Church, supra* [removal of piers which obstructed wharf]; *Needle v. Scheinberg,* 187 Md. 169, 49 A. 2d 334 (1946) [removal of large painted sign from side of building]; *Ives v. Edison,* 124 Mich. 402, 83 N. W. 120 (1900) [restoration of stairs to preserve easement]; *McCausland v. Jarrell,* 136 W. Va. 569, 68 S. E. 2d 729 (1951) [removal of obstruction preventing natural flow of water]. See also *Whalen v. Balto. & Ohio R. Co.,* 108 Md. 11, 69 A. 390 (1908), where the effect of a decree for a mandatory injunction was compared with a decree for specific performance.

ficers, who were summoned, namely, Abraham Goodman, Paul Goodman and Ellis B. Myers (hereinafter referred to as stockholders), complain that the chancellor was not justified in directing them, along with Woodmoor, to erect the fence in controversy. We agree. Even though a court will, in a proper case, disregard corporate entity and deal with substance rather than form as though a corporation did not exist [Brune, *Maryland Corporation Law and Practice,* §§ 371-373 (Rev. ed. 1953) and cases cited], we find it unnecessary to pierce the corporate veil in this instance and require Sedgemoor and the stockholders to participate in the erection of the fence. However, since it is clear that Sedgemoor and the stockholders, with full knowledge of the covenants in the deed from Woodmoor to Tulip, acted in concert with Woodmoor to accomplish a violation of Tulip's rights under the deed, we think that Sedgemoor and the stockholders should be prohibited from interfering in any manner, either directly or otherwise, with the erection of the fence by Woodmoor. See *Vander May v. Schoone-Jongen,* 130 N. J. Eq. 227, 21 A. 2d 819 (1941) [third persons may be enjoined from assisting party to contract to commit breach thereof]. Cf. *Horn v. Seth,* 201 Md. 589, 597, 95 A. 2d 312 (1953), where the tort of interference with a contract right was held to be somewhat analogous to a conspiracy.

The other claims that the granting of injunctive relief was premature and that the relief granted was too severe are without merit. The writ of injunction may be invoked to prevent prospective breaches of covenants. See *Baltimore, Etc., Live Stock Co. v. Union Rendering Co.,* 179 Md. 117, 120, 17 A. 2d 130 (1941). Moreover, we find no abuse of the discretion the chancellor exercised when he ordered the erection of a fence to prevent a threatened breach of the parking area covenants. See *McKeever v. Realty Corp.,* 183 Md. 216, 225, 37 A. 2d 305 (1944).

(iii). Release Of Obligations Under Acme Lease.

It was error to release and discharge Acme from its obligations under the lease. In the initial decree Acme had been required, along with other defendants, to participate in the construction of the boundary line wall originally ordered, but

there was no reference to the status of the lease. And the chancellor did not mention that aspect of the proceedings in his opinion filed prior to the initial decree. Nor did he subsequently file a statement of the grounds for modifying the decree with respect to the lease. The only reference thereto is a statement in the modified decree that he had "considered the * * * [issues raised by the cross-claim and the answers thereto] together with the evidence produced," but this does not supply the reasons for the decretal order contemplated by Rule 18 c.

On this cross-appeal, Acme contends that the boundary agreement was executed as a contemporaneous and integral part of the leasing arrangement between it and Sedgemoor and constituted a condition precedent and a substantial inducement for the lease; and that the decree ordering the erection of a fence by the court released it from the lease as a partial failure of consideration. On the other hand, it is contended by Sedgemoor, since it had performed its obligations under the lease, that the impossibility of performance does not excuse Acme; and that when Acme requested and was refused an option to cancel the lease, it "took its chances" that the boundary line agreement between Sedgemoor and Woodmoor was sufficient to preserve its rights under the lease.

Other than the boundary line agreement and the testimony of Acme's agent, the record is clear that there were no other conditions which might vary the terms of the lease. Certainly the boundary agreement in and of itself was not enough to show a breach of the leasing agreement. In fact, about all the boundary agreement does show is that Acme considered as important the free flow of pedestrian traffic across the boundary line. There was no proof that the obstruction of the boundary line by the erection of a wall or fence would be an extreme hardship capable of substantially or totally destroying the value of the leased premises. Nor was there any proof that the risk of a fence being erected on the boundary line was not foreseeable. Indeed; since there was an abundance of evidence that Acme actually knew of the existence of the covenants between Woodmoor and Tulip with respect to the parking area and was well aware of the location of the store it had

agreed to lease, it is difficult to conceive how it could have effectively claimed that the erection of some sort of barrier along the perimeter of the area was not foreseeable.

The English courts have held that the doctrine of frustration has no application to ordinary leases of buildings since the common law contemplates that a lease of realty is equivalent to a conveyance of an interest in land. *Matthey v. Curling,* [1922] 2 A. C. 180 (H. L.); *Whitehall Court v. Ettlinger,* [1920] 1 K. B. 680 (1918). Even so, the doctrine of frustration has been held applicable to leases in this country. Williston, *Contracts,* § 1955 (Rev. ed. 1938); *119 Fifth Avenue v. Taiyo Trading Co.,* 190 Misc. 123, 73 N. Y. S. 2d 774 (1947) [tenant released from obligations under lease where Alien Property Custodian padlocked the premises and took possession of contents]; *Orme v. Atlas Gas & Oil Co.,* 217 Minn. 27, 13 N. W. 2d 757 (1944) [total frustration of use of leased premises entitled lessee to terminate lease]. See also *McNally v. Moser,* 210 Md. 127, 122 A. 2d 555 (1956) [a supervening ordinance declaring illegal that which was formerly legal might create an impossibility of performance or a frustration of purpose which would allow termination of lease and end responsibility under it].

Generally, however, with respect to leases, the doctrine of frustration has been limited to cases of extreme hardship. In any event the lessee must prove that the risk of the frustrating event was not reasonably foreseeable and that the value of the leased premises was substantially or totally destroyed. *Lloyd v. Murphy,* 25 Cal. 2d 48, 153 P. 2d 47 (1944) [where risk of frustrating event is foreseeable, the absence of provision in lease to protect lessee gives rise to inference that risk was assumed]; *Standard Brewing Co. v. Weil,* 129 Md. 487, 99 A. 661 (1916) [tenant of saloon and restaurant who fails to protect himself against possible change in liquor laws by provision in lease is not relieved of liability to pay rent]; Williston, *op. cit., supra* [the applicability of doctrine of frustration with respect to lease depends on total, or nearly total, destruction of purpose of transaction]. See also *State, Use of Lane v. Dashiell,* 195 Md. 677, 75 A. 2d 348 (1950) [judicial, executive or administrative order which interferes with per-

formance of contract is not an excuse if circumstances are such as possibility of interference was recognized and risk was assumed by promisor] ; Cf. Restatement, *Contracts*, §§ 288, 458 (a), (b).

In the recent case of *Montauk Corp. v. Seeds*, 215 Md. 491, 138 A. 2d 907 (1958), we were concerned with a construction contract. There, Judge Prescott succinctly pointed out the three factors that courts usually look to in determining whether the doctrine of commercial frustration should be applied. He stated at p. 499: "The first and probably most important [factor] is whether the intervening act was *reasonably foreseeable* so that the parties could and should have protected themselves by the terms of their contract." Here, although Acme had full knowledge of the parking area covenants and the position of the store on the Sedgemoor property, it failed to protect itself from the possibility that the value of the lease might be thereafter impaired. Since it is apparent that the subsequent suit by Tulip and the issuance of an injunction was reasonably foreseeable, Acme was precluded from asserting the defense of frustration as an excuse for non-performance. The burden of proving its claim was on Acme, and it failed to do so. The chancellor was, therefore, in error when he released and discharged Acme from its obligations under the lease.

The decision of the chancellor to ignore the question as to the use of the Sedgemoor building as a food market was not improper. That part of the decretal order which required the erection of a wire fence was proper and will be affirmed, but only Woodmoor should have been required or commanded to perform the action specified and Sedgemoor and the stockholders should have been forbidden to interfere with the action required of Woodmoor. However, that part of the decree which released and discharged Acme from its obligations under the lease was improper and will be reversed.

Since that part of the decree pertaining to the erection of the fence must be amended so that the order granting the mandatory and prohibitory injunctions herein required may be given effect, we will remand the case for the passage of a decree not inconsistent with this opinion. The form and scope

. of the order granting the injunctive relief should comply with Rule 1195 i; and, in the amended decree to be passed upon remand, Acme's cross-claim against Sedgemoor and others should be dismissed.

*Case remanded for the passage of a decree not inconsistent with this opinion; three-fourths of the costs to be paid by Woodmoor Realty Corporation, Sedgemoor Realty Corporation and Abraham Goodman, Paul Goodman and Ellis B. Myers, and one-fourth by American Stores Company.*