PATUXENT DEVELOPMENT COMPANY, INC.
*v.* ADES OF LEXINGTON, INC.

[No. 280, September Term, 1969.]

*Decided April 1, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Charles A. Norris,* with whom was *Edward P. Camus* on the brief, for appellant.

*Paul J. Bailey,* with whom were *Joseph D. Weiner, Wallace Luchs, Jr.* and *King & Nordlinger* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This case involves a contest between a shopping center tenant and its landlord, in which feelings have run high,[1] but no higher than the stakes involved.

On 16 May 1961, Patuxent Development Co., Inc. (Patuxent) leased to Ades of Lexington, Inc. (Ades) a store containing some 26,000 square feet in Patuxent's shopping center at Lexington Park, St. Mary's County. The lease (the 1961 Lease), which identified Patuxent as the "Lessor" and Ades as the "Lessee" was for a term of 10 years and four months commencing 10 September 1961, at a monthly rental of $1,666.66 to which would be added a percentage of Ades' gross sales over $400,000 per annum. It provided also for two options to renew for successive terms of five years at a rent to be adjusted for increases in property taxes.

In paragraph 6 of the lease, Ades covenanted that it would not use the leased premises

> "* * * for any other purpose than that of a department store, variety store, Five-and-Ten Cent Store, off sale liquor, wine and beer sales, and soda fountain"

and in paragraph 24 agreed that it would not:

> "* * * sell or offer for sale groceries, meats, dairy products, vegetables, baked goods nor * * * compound any medicines on the leased premises."

---

1. There was testimony that during the course of the negotiations between the parties, which ultimately proved fruitless, the landlord's president had sent a funeral spray with a card reading "I hope you feel better you 'rat'" to the tenant's president, which was otherwise described by the florist through whom the floral tribute had been ordered. The testimony of the tenant's president that he had received from the same source literature casting doubt on the immortality of the human soul was not disputed.

The paragraph continued:

> "Nothing herein is intended to prevent Lessee from selling candy, chewing gum, popcorn, nuts or patent medicines."

The lease was otherwise unremarkable except for paragraph 28, which gave rise to the present controversy. The original typescript was altered in ink, apparently by the parties, who initialled the changes:

> "28. As part consideration for execution of this lease by Lessee, Lessor agrees that during the term of this lease ~~neither Lessor nor~~ Hiram Millison, the President of Lessor corporation, ~~nor any member of the immediate family of Hiram Millison,~~ nor any partnership or corporation in which Hiram Millison ~~or any member of his immediate family~~ owns an interest will lease any property within a radius of five (5) miles from the demised premises for use as a variety ~~department~~ store or Five-and-Ten-Cent Store. This restriction shall not apply during the second extended term provided for in the option period defined in paragraph 27 hereof, but during said option period, Lessee shall have first refusal on property intended to be leased for the purpose of a ~~department store,~~ variety store or Five-and-Ten-Cent Store."

The lease was executed on behalf of Patuxent by Hiram Millison, its then president, whose signature was attested by Larry Millison, and on behalf of Ades by Sigmund Ades. It seems to be conceded that at the time the lease was signed, and at the time of Hiram Millison's death on 22 April 1965, substantially all of the voting stock of Patuxent was owned by Mr. Millison. J. Laurence Millison (Larry), Hiram's son, succeeded his father as president of Patuxent and according to his testimony, now owns a controlling interest in Patuxent.

Ades opened a variety store known as King's Shoparama in the leased premises and was successful beyond anyone's hopes, doing a gross business, at the time the litigation commenced, of about $1,000,000 a year, and generating an annual rent of about $50,000.[2]

On 12 April 1967 Patuxent and Ades entered into an "Addendum" to the 1961 Lease, which was signed on behalf of Patuxent by L. Millison (Larry). The Addendum added, at an annual fixed rent of $1, some 4,000 square feet to the premises, and made a slight change in the formula under which the additional rent, based on a percentage of gross sales, was to be computed. There was a provision in paragraph 1 of the Addendum which is of particular significance:

> "The demised premises may be used for whatever type of business the Lessee desires to conduct in the premises, except that Lessee agrees not to sell any professional musical instruments or groceries, meats, dairy products, vegetables, baked goods, nor will Lessee compound any medicines upon the leased premises. Nothing herein is intended to prevent Lessee from selling candy, chewing gum, popcorn, nuts, or patent medicines. *Lessor and Lessee agree that they shall each be bound by the terms and provisions of the* [original lease] *dated the 16th day of May, 1961, * * * except as the same are changed, amended or modified by this Agreement * * *."* (emphasis supplied).

The important point is that paragraph 28 of the 1961 Lease was in no way altered by the Addendum.

Sometime in 1967, Patuxent had under consideration the construction of an additional building at Lexington Park, diagonally across the street from King's Shoparama

2. In his opinion, the chancellor commented, "The situation apparently progressed without incident on either side, except that apparently both sides made a lot of money. Whereas they were able to agree when they were poorer, now that they are richer they feel they have a right to bicker. It's not a phenomenon singular [to] Lexington Park * * *."

and well within five miles of the Shoparama. The negotiations which got under way between Patuxent and Drug Fair of Maryland, Inc. (Drug Fair) were complicated by the insistence of Patuxent's prospective mortgage lender that Ades waive the restriction contained in paragraph 28 of the 1961 Lease.

There were abortive conversations between Patuxent and Ades commencing in January 1968, looking toward a waiver by Ades of the restrictive provision of paragraph 28. When these failed, a lease was signed on 12 April 1968 between Patuxent and Drug Fair, under which 15,000 square feet of store space in the building being constructed were leased to Drug Fair for a 15 year term commencing 1 September 1968, with two five year renewal options, at a rental based on 4% of gross sales, with an annual minimum of $33,000.

The provisions of the Drug Fair lease are pertinent to the present controversy. By paragraph 10, Drug Fair covenanted

"* * * to use the demised premises for the conduct and operation of a retail drug store, including soda fountain and lunch counter service, similar to that now being operated by Drug Fair Stores in Metropolitan Washington and [to] use said premises for no other purpose whatsoever without the prior written consent of Lessor."

In paragraph 28, Patuxent agreed that it would not, during the original term or any renewal term,

"* * * lease for or permit the conducting of any other drug store or variety store business in the shopping center of which the leased premises are a part, nor upon any real estate within a radius of two (2) miles from said shopping center *in which Lessor or his affiliates now has or may hereafter acquire title or any interest whatsoever;* [3] * * *." (emphasis supplied).

---

3. The use of this phraseology is reminiscent of paragraph 28 of the 1961 Lease with Ades.

The paragraph concluded with a statement that the restriction was not to be construed as applying to then existing tenancies. The lease was executed on behalf of Patuxent by J. Laurence Millison, its president.

On 20 May 1968, Ades filed in the Circuit Court for St. Mary's County a bill of complaint against Patuxent; J. Laurence Millison, individually, and Drug Fair, seeking that Patuxent be enjoined from leasing the premises to Drug Fair, and that Drug Fair be enjoined from occupying the premises. Other prayers for relief asked that Patuxent and Millison be enjoined from harassing Ades, and that exemplary damages of $500,000 be assessed against Patuxent and Millison.

Drug Fair's demurrer was sustained by the lower court, and when Ades elected not to amend its bill of complaint, the case came on for trial against Patuxent and Millison. From a decree enjoining Patuxent from leasing premises owned by it within a five mile radius of Ades' store to Drug Fair or any other tenant for use as a variety or five and ten cent store; enjoining Drug Fair, in the event it occupies the premises leased to it, from selling "items customarily sold by a variety store, not including, however, items such as prescription and patent medicines, cosmetics, tobacco, food and liquor," and awarding compensatory damages of one cent and costs, Patuxent has appealed.

Patuxent challenges the validity of the decree entered below on three grounds: (i) that the restrictive covenant contained in paragraph 28 of the 1961 Lease was personal to Hiram Millison, and expired on his death; (ii) that if the covenant survived Hiram Millison's death and was binding on Patuxent, the proscription against leasing property within a five mile radius for use as a variety store or five and ten cent store does not preclude Drug Fair from operating a store similar to those which it operates in Metropolitan Washington; and, (iii) the court erred in issuing an injunctive order against Drug Fair after its demurrer had been sustained and it had been released from further participation in the proceedings. We

shall consider these contentions in order, adding such additional facts as may be appropriate to the issues.

### (i)

Patuxent buttresses its argument that the covenant contained in paragraph 28 of the 1961 Lease was personal to Hiram Millison and not binding on Patuxent by referring us to a long line of our prior decisions which hold that restrictive covenants are to be strictly construed against the person in whose favor they were made and liberally, in favor of the unrestricted use of the property, *Maryland Trust Co. v. Tulip Realty, Inc.*, 220 Md. 399, 153 A. 2d 275 (1959); *Osborne v. Talbot,* 197 Md. 105, 78 A. 2d 205 (1951); *Matthews v. Kernewood,* 184 Md. 297, 40 A. 2d 522 (1945); *Himmel v. Hendler,* 161 Md. 181, 155 A. 316 (1931); *Bartell v. Senger,* 160 Md. 685, 155 A. 174 (1931); *Peabody Heights Co. v. Willson,* 82 Md. 186, 32 A. 386, 1077 (1895), that if there is doubt, the covenant will be construed in favor of an unrestricted use, *Saratoga Bldg. & Land Corp. v. Roland Park Apt. Stables Co.,* 146 Md. 152, 128 A. 270 (1924), and that a restrictive covenant should not be extended by implication beyond its original intent, *Maryland Trust Co. v. Tulip Realty, Inc., supra; Checket-Columbia Co. v. Lipman,* 201 Md. 494, 94 A. 2d 433 (1953); *Baltimore Butchers Abattoir & Live Stock Co. v. Union Rendering Co.,* 179 Md. 117, 17 A. 2d 130 (1941). Cf. *Savon Gas Stations v. Shell Oil Co.,* 309 F. 2d 306 (4th Cir. 1962) *aff'g* 203 F. Supp. 529 (D.Md. 1962), *cert. den.* 372 U. S. 911, 83 S. Ct. 725, 9 L.Ed.2d 719 (1963).

Forgetting, for the moment, the excisions and interlineations, the covenant contained in paragraph 28 is quite clear:

> "* * * [Patuxent Development Company, Inc.] agrees that during the term of this lease, Hiram Millison, the President of [Patuxent Development Company, Inc.], nor any partnership or corporation in which Hiram Millison owns an interest will lease any other property within a

radius of five (5) miles from the demised premises for use as a variety store or Five-and-Ten-Cent Store."

It is beyond question that this was an obligation which Patuxent assumed as lessor and had the duty to perform since at the time of the undertaking, Millison owned a controlling interest in Patuxent. Any fleeting doubt which remained was dispelled on 12 April 1967 when Patuxent, after Millison's death, entered into the Addendum which ratified and confirmed the 1961 Lease.

Once negotiations have been integrated into an agreement, if the language is clear and unambiguous and there is no fraud, duress or mutual mistake, the true test of what was meant is not what a party to the contract intended it to mean but what a reasonable person in the position of the parties would have thought it meant. *Katz v. Pratt Street Realty Co.*, 257 Md. 103, 262 A. 2d 540 (1970), and cases there cited, particularly *Ray v. Eurice*, 201 Md. 115, 127, 93 A. 2d 272 (1952). We conclude, as did the chancellor, that the undertaking was binding on Patuxent, and not merely personal to Hiram Millison. As we said in *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A. 2d 687 (1958) : "* * * [T]he parties to the * * * lease were experienced business people. It would seem strange to suppose that they did not deal with each other and use business language in such a way as to accomplish an obvious and common sense business result."

(ii)

Patuxent argues that even if it is bound by the restriction contained in paragraph 28, the proscription against leasing property within a five mile radius for use as a variety store or five and ten cent store does not preclude Patuxent from leasing premises to Drug Fair for a store similar to those which it operates in Metropolitan Washington.

To accept this argument would require us to close our eyes to the facts established by the evidence introduced

below. It is uncontroverted that the typical Drug Fair operation sells, among other items not commonly found in drugstores, garden implements, unpainted furniture, men's, women's and children's clothing, paints, appliances, luggage, handbags, jewelry, phonograph records, radios, rugs, lamps, toys, bedding, hardware, housewares and books. In fact, Sigmund Ades, the president of Ades, testified that he had inspected 15 Drug Fair stores in the Maryland and Virginia suburbs of Washington and had found that the area devoted to the compounding of prescriptions averaged less than 3% of total floor space and that the balance of floor space was devoted to the sale of the same lines of products sold by King's Shoparama. One of the appellee's witnesses summed up by describing Drug Fair as "a variety store with a prescription department." [4]

Witnesses produced by Patuxent spoke in a similar vein. Laurence Millison on direct examination was asked:

"Q And are you familiar with the difference in the industry between the definition of drug store and variety store?

"A Yes, I am.

"Q Is there a difference?

"A Oh, yes, no question about it. A clear cut difference.

"Q What is the difference?

"A A drug store has a registered pharmacist. He must be a college—he's a doctor on duty at all times in the store. There might be lapping items that they both sell, but in a large variety store like * * * King's [Shoparama], they have a large department of these items. Per se, we'll take

---

4. There is support for this conclusion. See Practicing Law Institute transcript, "Business and Legal Problems of Shopping Centers" (1968) at 122. Francis P. Gunning, one of the panelists, said, in reply to a question: "For example, 10 years ago the term 'variety store' had a very limited meaning. Today it has a much wider one. And there is now the so-called 'drug store' which sells the same merchandise as a variety store."

hardware. They have a large department of hardware. A drug store like Dart Drug, which I had as a tenant, or the drug store I have now, or the Drug Fair, they have a little box, maybe 3 or 4 screwdrivers or 2 or 3 hammers, something like little wrenches.[5] There's a big difference. There's a big difference.

"Q And what is Drug Fair, drug store or variety store?

"A It's—Drug Fair is a drug store.

"Q Now, in the trade, what is a variety store?

"A If I understand correctly from the International [Council] of Shopping Centers, anyone can call themselves a variety store or a Five & Dime, as long as they do not have food to go, such as groceries, or as long as they do not sell furniture because then they become a department store, or so long as they do not have a pharmacist and compound medicine. I also understand that a drug store under the blue laws is allowed to stay open on Sundays. A variety store is not allowed to stay open on Sundays."

Stanley H. Horowitz, the Assistant Secretary of Drug Fair, called as a witness by Patuxent, was asked on direct examination:

"Q Does the word 'variety store' mean anything to you?

"A Yes.

"Q What does it mean?

"A It means a store that sells a variety of items of five and ten.

---

5. Among 37 photographs of Drug Fair stores produced by Ades and admitted below as plaintiff's exhibit No. 3 were two pictures of the Drug Fair Store in the Silver Spring Shopping Center. They clearly show a rack in which more than 20 hoes, shovels and rakes are displayed, a stack of 20-gallon galvanized garbage cans, and more than 50 coils of garden hose on a counter.

"Q What difference is there, if you know, between variety store and Drug Fair or drug store?

"A Well, the most specific difference of course, is the fact that there is no pharmacist in a variety store. The requirements for a pharmacist—the requirement for a drug store are that they have to have a pharmacist on duty at all times."

Mr. Horowitz then went on to say that an additional distinction between a variety store and a drugstore lies in the fact that a variety store carries greater quantities of merchandise. See *Variety, Inc. v. Hustad Corp.*, 145 Mont. 358, 400 P. 2d 408 (1960).

A not dissimilar question was before this Court in *Glen Burnie Plaza v. Schreiber*, 220 Md. 303, 152 A. 2d 807 (1959). There, Glen Burnie Plaza had leased to Schreiber Brothers a store in a shopping center for use as a retail food supermarket. The lease enumerated certain "exclusive items" and continued:

"* * * Landlord will not permit any other tenant of the shopping center (other than the within Tenant) to sell any food product items normally and generally sold by food markets or to sell any of the above 'Exclusive Items' except as noted below.

"It is understood that Sun Ray Drug Co., as a tenant in the shopping center, may sell groceries normally sold in a drugstore." 220 Md. at 306.

Sun Ray had leased a store of some 10,000 square feet, and subsequently sublet 5,500 square feet of space to a subsidiary of Glen Burnie Plaza for the sale of groceries. On appeal from a decree enjoining such use, this Court affirmed. Judge (later Chief Judge) Prescott spoke for the Court:

"* * * In the first place, it is very unusual that

a drugstore would devote more than one-half its floor space to the purpose of disposing of groceries. In addition, it was obviously the intention of the parties that the provision for the selling of 'groceries normally sold in a drugstore' was contemplated as being utilized in conjunction with the actual operation of a drugstore. * * * The conduct * * * shows an unfortunate and unwarranted attempt to avoid, evade and circumvent the agreement with Schreiber to the effect that it would have the exclusive right to sell particular items of groceries in the shopping center, subject to the right of Sun Ray to sell those usually sold in drugstores." 220 Md. at 308-09.

Patuxent's lease with Drug Fair similarly endeavored to circumvent the restrictions in the Ades lease. Many of the items which Drug Fair sells in its Metropolitan Washington stores are those commonly sold in variety stores. It was the obvious intention of the restrictive clause of the 1961 Lease to protect Ades from such competition.

It is well settled in this State that a covenant in a lease to the effect that a tenant shall have the exclusive right of conducting a specified business on the leased premises may be injunctively enforced against both the landlord and a subsequent tenant of another part of the landlord's premises, who, at the time it entered into the lease, had notice of the right granted to the original tenant. *Freedman v. Seidler*, 233 Md. 39, 45, 194 A. 2d 778 (1963) ; *Schmidt v. Hershey*, 154 Md. 302, 140 A. 363 (1928). Compare *Lucente v. Davis*, 101 Md. 526, 61 A. 622 (1905) and see also *Snavely v. Berman*, 143 Md. 75, 121 A. 842 (1923) ; *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 137 A. 2d 687 (1958) ; Note, *Restrictive Covenants in Shopping Center Leases*, 34 N.Y.U. L.Rev. 940 (May, 1959) and Annotation, 97 A.L.R.2d 4 (1964).

Drug Fair's prescription department could be likened

to the camel's nose in the tent. Although Ades could not keep the nose out, it did not have to share its tent with the camel.

### (iii)

Patuxent's final contention is that the court erred in entering an injunction against Drug Fair at a time when Drug Fair was no longer a party to the proceeding, its demurrer having been sustained before the case came on for trial. We regard this objection as well taken, although not the whole answer to the issue involved. While an injunction cannot issue against one not a party to the case, *Brenneman v. Roth,* 212 Md. 491, 499, 130 A. 2d 301 (1957) and see Rule BB 74 and *Belvedere Hotel Co. v. Williams,* 137 Md. 665, 113 A. 335, 14 A.L.R. 622 (1921) this does not mean that Drug Fair is insulated from the power of the Court.

> "The general rule is that one is bound by an injunction even though he is not a party to the suit therefor, if he has notice or knowledge of the injunction and is within the class of persons whose conduct is intended to be restrained, or acts in concert with such a person." 42 Am. Jur. 2d *Injunctions* § 320 (1969) at 1120.

See also 43 C.J.S. *Injunctions* § 220 (1945) at 960 and Annotation, 15 A.L.R. 386 (1921).

Maryland has followed the general rule, at least since *Murdock's Case,* 2 Bland 461, 486-88 (1830) which was recognized more recently in *Snavely v. Berman, supra,* and *Kelly v. Montebello Park Co.,* 141 Md. 194, 118 A. 600, 28 A.L.R. 33 (1922). See also Miller, *Maryland Equity Procedure* § 610 (1897) at 714 and compare *Wingert v. State,* 132 Md. 243, 248, 103 A. 437 (1918). Drug Fair as a subsequent tenant had constructive notice of the provisions of a recorded lease and gained actual knowledge of the restriction through its peripheral participation in the efforts of Patuxent and Ades to reach an accommodation and its joinder as a defendant. If it acts in concert with Patuxent to violate the court's decree it

may subject itself to contempt proceedings and certainly can be enjoined. *Snavely v. Berman, supra; Schmidt v. Hershey, supra; Grand Union Co. v. Laurel Plaza, Inc.,* 256 F. Supp. 78 (D. Md. 1966) *aff'd* 369 F. 2d 697 (4th Cir. 1966).

While we propose to remand the case in order that the decree may be reformed by omitting Paragraph 2, which purported to enjoin Drug Fair, we are constrained to point out that the language proscribing "the sale at retail of items customarily sold by a variety store, not including, however, items such as prescription and patent medicines, cosmetics, tobacco, food and liquor," is possibly too narrow. In the event that Drug Fair determines prior to 10 January 1977 to occupy premises owned by Patuxent located within a five mile radius of the store occupied by Ades, it may well be appropriate in any proceeding brought by Ades to establish by competent testimony the items customarily sold in a drugstore which is pharmacy-oriented other than prescription and patent medicines, cosmetics, tobacco, food and liquor, which were those enumerated in the decree.

> *Case remanded for entry of decree conformable with this opinion; costs to be paid by appellant.*