**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-2548

LORD & TAYLOR, LLC,

Plaintiff - Appellant,

v.

WHITE FLINT, L.P., f/k/a White Flint Mall, LLLP,

Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Roger W. Titus, Senior District Judge.
(8:13-cv-01912-RWT)

Argued: January 28, 2015                 Decided: March 4, 2015

Before WILKINSON, AGEE, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Harris wrote the opinion,
in which Judge Wilkinson and Judge Agee joined.

**ARGUED:** Michelle DeFinnis Gambino, GREENBERG TRAURIG LLP,
McLean, Virginia, for Appellant. Stuart Scott Morrison, KATTEN
MUCHIN ROSENMAN LLP, Washington, D.C., for Appellee. **ON BRIEF:**
Kevin B. Bedell, David G. Barger, GREENBERG TRAURIG LLP, McLean,
Virginia, for Appellant.

PAMELA HARRIS, Circuit Judge:

Plaintiff-Appellant Lord & Taylor, LLC ("Lord & Taylor") has for many years operated a retail store connected to the White Flint Shopping Center (the "Mall"), an enclosed shopping mall along Rockville Pike in Montgomery County, Maryland. In October 2012, the Montgomery County Council approved plans to tear down the Mall and redevelop the site into a mixed-use, town-center-style development as part of the county's broader plan to revitalize the surrounding area. Lord & Taylor filed this action to stop the Mall's owner, Defendant-Appellee White Flint, L.P. ("White Flint"), from going forward with the redevelopment. In addition to declaratory relief, Lord & Taylor seeks a permanent injunction that would prohibit White Flint from replacing the Mall with the proposed town center.

The district court denied Lord & Taylor's request, concluding that an injunction would be unworkable in light of the already advanced stage of the project: Either the court would be required to supervise the repopulation and restoration of the largely vacant Mall, or the effect of its order would be to suspend the site in its current unusable state. We see no grounds for disturbing the district court's reasoned exercise of its equitable discretion, and therefore affirm.

**I.**

**A.**

In 1975, White Flint opened discussions with Lord & Taylor and Bloomingdale's, a nonparty to this case, about development of what would become the Mall. Ultimately, Lord & Taylor and Bloomingdale's agreed to lease land immediately adjacent to the Mall and serve as retail "anchor" tenants. In exchange, White Flint agreed that it would construct and then maintain a "first class high fashion regional [s]hopping [c]enter," on the Mall property.

The parties memorialized their understanding in a reciprocal easement agreement ("REA"), committing White Flint to continued operation of a three-story, enclosed mall on the site, and detailing the layout of the Mall and its surrounding internal roadways and parking areas. Under the REA, most of the site may be used only for retail purposes, and White Flint may build additional structures only with Lord & Taylor's consent. Any changes to the Mall, including alterations to its "architectural design or appearance," also must be approved by Lord & Taylor. All of these conditions are treated by the REA as restrictive covenants that "run with the Land," creating rights in real property. They remain operative at least through 2042, and Lord & Taylor may extend them until 2057 by exercising its final lease-renewal option.

The Mall opened in 1977 and operated smoothly for many years. More recently, however, the Mall began to experience a decline in business. Where to place the blame for that decline is disputed by the parties. But whatever the cause, in 2012, Bloomingdale's opted not to renew its lease at the Mall site. By 2013, 75 percent of Mall tenants, accounting for at least a third of the Mall's space, had left. Since then, the Bloomingdale's building has been demolished and the remaining businesses have closed. The Mall was shuttered permanently on January 4, 2015, and Lord & Taylor alone remains open for business.

In November 2011, White Flint released a preliminary plan to redevelop the site (the "Sketch Plan"), as part of Montgomery County's broader initiative to redevelop the surrounding area (the "Sector Plan"). The Sector Plan is a massive public-private undertaking. Once complete, it will transform the area, anchored by a station of the Washington metropolitan area subway, into a 430-acre urban center, with 14,000 new residential units and 7.5 million square feet of new mixed-use space. Execution of the Sector Plan is expected to involve $1 billion in new public works and eventually to generate $40 billion in additional tax revenue.

White Flint's Sketch Plan also is ambitious. The Sketch Plan would transform the Mall site into the sort of mixed-use

4

development increasingly popular across the country, with a 45-acre town center including 2,400 apartment units, parks and schools, a hotel, and at least three high-rise office buildings. The Lord & Taylor store would remain, but the enclosed Mall would be demolished, along with portions of the parking lots and internal roadways surrounding Lord & Taylor. Montgomery County approved the plan in October 2012, and considers it "an essential component of the Sector Plan."

**B.**

Lord & Taylor objects to implementation of the Sketch Plan and the contemplated redevelopment of the Mall site. According to Lord & Taylor, what it was promised by White Flint was a "first class . . . [s]hopping [c]enter," devoted to retail uses and consistent with the design specifications memorialized in the REA. The town center that White Flint proposes to build around its store instead, Lord & Taylor argues, violates the plain terms of the REA and will negatively affect the store's business, disrupting customer access by destroying internal roads and parking areas and denying the store the benefit of foot traffic from Mall customers.

Negotiations between Lord & Taylor and White Flint reached an impasse in the spring of 2013, and in July 2013, Lord & Taylor filed the two-count complaint that is the basis for this lawsuit. Count I, for declaratory relief, seeks a declaration

5

that the REA precludes White Flint from redeveloping the Mall site as contemplated by the Sketch Plan and instead requires White Flint to continue operation of a "first class high fashion retail [s]hopping [c]enter."  Count II – the count at issue here – seeks a permanent injunction compelling White Flint to honor the terms of the REA.  Specifically, Lord & Taylor asks the court to enjoin White Flint "from taking any steps to carry out or construct [the] redevelopment" in a manner inconsistent with the REA and to "require [White Flint] to abide by its obligations under the [REA] to operate a first class high fashion regional retail [s]hopping [c]enter."

White Flint moved for partial summary judgment with respect to Count II of the complaint.  It argued, in part, that it would be infeasible for the district court to enforce an injunction requiring what was at the time a mostly empty Mall to resume operations, and then to maintain its status as a "first class high fashion shopping center" until as late as 2057.  Lord & Taylor, LLC v. White Flint, L.P., Case No. 8:13-cv-01912-RWT (D. Md. Sept. 5, 2013), ECF No. 15.  White Flint also argued that the equities of the case did not favor specific performance of the terms of the REA and a halt to the redevelopment because of the significant public interest in seeing the project go forward and the time and expense already devoted to the project.

The district court agreed and dismissed Count II of the complaint. It assumed for purposes of its decision that Lord & Taylor could show under Count I that the proposed redevelopment would breach the REA, and that Lord & Taylor would be entitled to damages for any harm that resulted. It concluded, however, that injunctive relief would be infeasible under the circumstances. Because of physical changes to the site (most notably the demolition of the Bloomingdale's store) and what was then a 75-percent vacancy rate, the court reasoned, an injunction requiring White Flint to operate the "first class" shopping center contemplated by the REA would require the court to supervise "rebuilding [and] bringing tenants back in" to the Mall – a task the court deemed outside its competence. "[F]or me to enter into this case and try to enjoin an ongoing development project like this is just not feasible."

The district court subsequently denied Lord & Taylor's motion for a stay pending appeal and preliminary injunction. Lord & Taylor, LLC v. White Flint, L.P., Case No. 8:13-cv-01912-RWT (D. Md. Feb. 7, 2014), ECF No. 64. The court reiterated its practical concerns, explaining that even maintaining the status quo was no longer feasible given the "advanced stage[]" of the project and the "reality that the [M]all is almost completely vacant and partially demolished."

7

Lord & Taylor timely noted its appeal to this court. It also moved for a stay of the district court's decision, which we denied. Lord & Taylor, LLC v. White Flint, L.P., No. 13-2548 (4th Cir. Mar. 14, 2014).

## II.

### A.

Lord & Taylor's first contention on appeal is that the district court erred by failing to apply the correct Maryland law to its request for injunctive relief. We review this claim de novo, see Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013) (de novo review governs district court decision on injunctive relief when "contested issue is a question of law"), and find it unpersuasive.

The parties agree, as do we, that Maryland substantive law applies in this diversity action, and governs Lord & Taylor's Count II claim for a permanent injunction. See Capital Tool and Mfg. Co., Inc. v. Maschinenfabrik Herkules, 837 F.2d 171, 172 (4th Cir. 1988) (Erie doctrine requires courts to apply state substantive law to a request for permanent injunctive relief in diversity cases); see also 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2943 (3d ed. 2014) (Erie rationale extends to requests for injunctive relief). According to Lord & Taylor, however, the district court took a

8

different approach, and relied instead on the federal-law standard for injunctions in denying relief.

We do not read the record that way.  The parties' briefing on summary judgment may have generated some confusion as to the appropriate choice of law.  But the district court directly addressed the choice-of-law question at the summary judgment hearing and expressly clarified in its decision that it was applying Maryland law.  We take the district court at its word and have no reason to doubt that it properly identified Maryland substantive law as controlling.

Lord & Taylor argues in the alternative that if the district court applied Maryland law, then it misapplied it badly, relying on factors that have no place in the analysis under Maryland precedent.  Maryland law, Lord & Taylor contends, strongly favors injunctive relief for breaches of restrictive covenants – so strongly that injunctions are granted almost as a matter of course and regardless of factors like the public interest or the availability of monetary damages to compensate for a breach.  If White Flint's proposed redevelopment would violate the REA – and the district court assumed as much for purposes of summary judgment – then according to Lord & Taylor, there was virtually nothing left for the court to do but enjoin the breach.

9

We disagree. It is true that an injunction typically is an appropriate remedy for breach of a restrictive covenant under Maryland law. See Dumbarton Improvement Ass'n., Inc. v. Druid Ridge Cemetery Co., 73 A.3d 224, 233 (Md. 2013). But injunctive relief is not automatic, and the presumption in its favor does not displace a trial court's traditional discretion when it sits in equity, see Roper v. Camuso, 829 A.2d 589, 601 (Md. 2003) ("Trial courts are granted broad discretionary authority to issue equitable relief."). Indeed, the very cases cited by Lord & Taylor recognize that injunctive relief remains subject to "sound judicial discretion" even where restrictive covenants and real property rights are concerned. Chestnut Real Estate P'Ship v. Huber, 811 A.2d 389, 401 (Md. Ct. Spec. App. 2002); see also Redner's Mkts., Inc. v. Joppatowne G.P. L.P., Civ. A. No. 11-1864-RDB, 2013 WL 2903285, at *5 (D. Md. June 13, 2013).

The parties dispute the precise scope of this equitable discretion and the particular factors that should guide its exercise. We need not resolve any difficult questions of state law to decide this case, however, because one thing that Maryland law makes perfectly clear is that trial courts may take account of feasibility concerns – like those relied on by the district court here – in considering injunctive relief for breach of a restrictive covenant.

In this context, as in others, trial courts retain discretion to deny specific performance or injunctive relief (Maryland case law does not distinguish between the two for these purposes) where enforcement would be "unreasonably difficult" or require "long-continued supervision" by the court. See Edison Realty Co. v. Bauernschub, 62 A.2d 354, 358 (Md. 1948). So, for instance, an injunction may be denied as infeasible if it would compel the parties to continue a commercial relationship, or require the court to closely monitor the caliber of their performance. See, e.g., M. Leo Storch L.P. v. Erol's, Inc., 620 A.2d 408, 412-14 (Md. Ct. Spec. App. 1993) (denying injunction to enforce continuous-operation lease clause on feasibility grounds); Edison Realty Co., 62 A.2d at 358 (specific performance may be denied where court would be required to issue "a multiplicity of orders . . . in its endeavor to superintend [the parties'] work"). Indeed, because such affirmative injunctions are difficult to draft clearly and even harder to enforce, Maryland courts typically will issue them only where no other relief is possible. See Md. Trust Co. v. Tulip Realty Co. of Md., Inc., 153 A.2d 275, 284 (Md. 1959). And the inquiry into feasibility is itself wide ranging and equitable in nature, with courts instructed to consider broadly the "advantages to be gained" from injunctive relief as well as "the harm to be suffered" if an injunction is denied as

11

infeasible.  <u>M. Leo Storch L.P.</u>, 620 A.2d at 412 (quoting <u>Edison Realty Co.</u>, 62 A.2d at 358).

Whether the district court properly exercised its discretion in determining that injunctive relief would be infeasible in this case is a separate question, which we address in turn.  The point here is simply that Maryland law did not require the district court to turn a blind eye to feasibility and related equitable concerns.  On the contrary:  Maryland law clearly authorized the district court to go beyond the state-law presumption in favor of injunctive relief to consider the feasibility of what it was being asked to do.

**B.**

Even on this account of the law, Lord & Taylor argues, the district court erred, because the injunctive relief it seeks would in fact be entirely feasible.  On this claim, our review of the district court's determination is highly deferential.  When a district court's decision rests on evaluation of equitable considerations or other traditionally discretionary factors, we generally apply an abuse of discretion standard.  See <u>Ray Commc'ns., Inc. v. Clear Channel Commc'ns., Inc.</u>, 673 F.3d 294, 299 (4th Cir. 2012) (reviewing application of the doctrine of laches for abuse of discretion); <u>Baldwin v. City of Greensboro</u>, 714 F.3d 828, 833 (4th Cir. 2013) (reviewing application of equitable tolling doctrine for abuse of

12

discretion). That deferential approach makes perfect sense when it comes to the feasibility of equitable relief: The district court is better positioned than we are to weigh the costs and benefits of injunctive relief and, in particular, to assess the practical difficulties of enforcement of an injunction – difficulties that will fall in the first instance on the district court itself. Accordingly, we will review the district court's feasibility determination for abuse of discretion, and disturb it only if we find that the court "committed a clear error of judgment." Brown v. Nucor Corp., 576 F.3d 149, 161 (4th Cir. 2009) (applying abuse of discretion standard to district court class-certification determination (quoting Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999))).

Like the district court, we must take account of the practical realities of the situation. At the time of the district court's decision in December 2013, Bloomingdale's had declined to renew its lease, and the building it occupied had been demolished. Much of the Mall itself was vacant, and according to Lord & Taylor, many of the remaining tenants were on short-term leases due to expire in 2014. Restoring the Mall to its former glory, as Lord & Taylor requested in Count II of its complaint, would have required more than a negative prohibition on the site's redevelopment. It would have

13

necessitated an affirmative injunction ordering White Flint to transform the now-fading Mall back into a "first class high fashion regional retail [s]hopping [c]enter" – the kind of order that is so hard to draft with specificity and then to enforce that Maryland courts generally will grant it only as a last resort. See Md. Trust Co., 153 A.2d at 284.

In this case, affirmative injunctive relief would have been even more impractical than usual, thanks to the highly detailed provisions of the REA. An order that White Flint "abide by its obligations under the REA," as sought by Lord & Taylor, also would require judicial oversight of compliance with the myriad of REA conditions that control every facet of the Mall's operations, from the distribution of parking and interior access roads to the placement of entrances to the design of the various retail stores and restaurants that populate the Mall. And once it had ascertained that the Mall's operations were again compliant with every provision of the REA, the district court's job still would not be done: It would have to ensure that the Mall remained in compliance for the duration of the REA, at least until 2042 and potentially for over forty years. See M. Leo Storch L.P., 620 A.2d at 414 (declining to enforce continuous-operation clause because court would be required to monitor ongoing performance). Such long-term, ongoing supervision eventually would entangle the district court in

14

every aspect of the Mall's daily operations, with any potential violation of the REA's specifications becoming fair game in a subsequent contempt proceeding.

The cases Lord & Taylor cites to argue that all of this would be perfectly feasible suggest to us just the opposite. The scale and complexity of the Mall's operations – spread over 45 acres, and potentially involving dozens of new counter-parties as the Mall repopulates – and the duration of the proposed injunction have no parallel in the Maryland case law. The injunction sought here would be nothing like one that prohibits operation of a single nearby competitor, see Redner's Mkts., Inc., 2013 WL 2903285, at *2 (enjoining operation of a rival grocery store in the same strip mall), or resolves a single dispute over misused office space, see City of Bowie v. MIE, Props., Inc., 922 A.2d 509, 518, 538 (Md. 2007) (enjoining operation of a dance studio). By comparison, Maryland courts have found injunctive relief infeasible under circumstances far more streamlined and straightforward than these, involving purely bilateral commercial relations. See M. Leo Storch L.P., 620 A.2d at 414 (refusing to order a tenant to reoccupy leased retail space on feasibility grounds). We can find no Maryland precedent, and Lord & Taylor provides none, even suggesting that it would be feasible for the court to craft and enforce an order directing White Flint to reboot and then maintain a "first class

15

high fashion regional retail [s]hopping [c]enter," consistent with the REA's detailed specifications, through the year 2057.

At oral argument, Lord & Taylor refined its position, suggesting that it would be satisfied with a more limited, negative injunction that simply prohibited White Flint from moving ahead with the destruction of the Mall and its adjacent parking areas.  That is essentially the same proposal Lord & Taylor offered to the district court when it moved there for a stay pending appeal.  The district court rejected this version of the proposed relief as well, deeming it "unrealistic" to require White Flint to maintain the status quo of a mostly empty Mall with a demolished "anchor" store on one side.  In effect, the district court held, the redevelopment had passed the point of no return.

Again, we must attend to the realities of the situation facing the district court.  A negative injunction, as the court understood, would freeze in place a vacant and partially demolished Mall, tantamount to a judicially mandated blight on the area.  That outcome would serve neither party to the dispute, let alone the interests of the general public.  Indeed, it is so patently unworkable that Lord & Taylor defends it not on its own terms, but as a form of leverage that might encourage White Flint to resume Mall operations, consistent with the REA.  But the district court cannot simply assume that best-case

scenario, and must instead contend with the very real possibility that a negative injunction would produce nothing but an empty and unusable 45-acre Mall site in the heart of Montgomery County's redevelopment project.

Moreover, even if a negative injunction did send White Flint back to the drawing board and eventually to the negotiating table, feasibility concerns would remain. Should the parties dispute whether any White Flint proposal to repopulate and restore the Mall lived up to the detailed specifications of the REA or produced a sufficiently "first class" and "high fashion" shopping experience, the district court would find itself inserted once again into the thick of ongoing and complex commercial relationships. And any effort to resolve that dispute by way of injunctive relief would raise precisely the feasibility issues already described.

Taken together, these concerns are more than enough to persuade us that the district court did not commit a "clear error of judgment," Brown, 576 F.3d at 161, in finding that injunctive relief would be infeasible.* Continuous judicial

---

* Lord & Taylor contends that additional discovery was necessary before the district court could grant White Flint's motion for summary judgment on Count II of the complaint. But the discovery sought by Lord & Taylor had no connection to feasibility, and so could not have affected the district court's feasibility determination or our disposition of this appeal. As we have explained, the district court's feasibility analysis

17

supervision of commercial relationships on this scale may place a particular strain on a district court, and the decision to refuse such intervention goes to the heartland of that court's discretion to manage its own affairs. Where, as here, the district court follows applicable state law and reasonably exercises its discretion in denying injunctive relief as infeasible, we have no grounds to second guess its decision.

## III.

For the reasons stated above, we affirm the district court's dismissal of Count II of the complaint.

AFFIRMED

---

turned on the current realities of the situation and the terms of the REA, neither of which implicates any material factual dispute between the parties.