**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1995**

LORD & TAYLOR, LLC; LT PROPCO, LLC,

     Plaintiffs – Appellees,

  v.

WHITE FLINT, L.P., f/k/a White Flint Mall, LLP, now known as White Flint Mall, LLLP,

     Defendant – Appellant,

  and

ALAN H. GOTTLIEB,

     Defendant.

**No. 15-2064**

LORD & TAYLOR, LLC; LT PROPCO, LLC,

     Plaintiffs – Appellants,

  v.

WHITE FLINT, L.P., f/k/a White Flint Mall, LLP, now known as White Flint Mall, LLLP,

     Defendant – Appellee,

  and

ALAN H. GOTTLIEB,

                  Defendant.

_____

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:13-cv-01912-RWT)

_____

Argued: December 6, 2016                                 Decided: February 28, 2017

_____

Before WILKINSON, AGEE, and HARRIS, Circuit Judges.

_____

Affirmed by published opinion. Judge Harris wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

_____

**ARGUED**: Stuart Scott Morrison, KATTEN MUCHIN ROSENMAN LLP, Washington, D.C., for Appellant/Cross-Appellee. Michelle DeFinis Gambino, GREENBERG TRAURIG LLP, McLean, Virginia, for Appellees/Cross-Appellants. **ON BRIEF**: Laura Metcoff Klaus, Washington, D.C., David G. Barger, GREENBERG TRAURIG LLP, McLean, Virginia, for Appellees/Cross-Appellants.

_____

2

PAMELA HARRIS, Circuit Judge:

Lord & Taylor, LLC, operates a retail department store along Rockville Pike in Montgomery County, Maryland. From 1977 to 2015, the store was part of the White Flint Shopping Center, an enclosed shopping mall (the "Mall"). But in 2015, the Mall's operator, White Flint, L.P., closed the Mall and began demolition in order to make way for a mixed-use redevelopment. Lord & Taylor sued White Flint, claiming that White Flint had breached the parties' contract by closing the Mall without Lord & Taylor's consent.

A jury found White Flint in breach of contract and awarded Lord & Taylor $31 million in damages. Both parties appeal, arguing primarily that the damages award is too high (White Flint) or too low (Lord & Taylor). Because we find no error in the district court's capable management of a lengthy trial, we affirm.

## I.

### A.

This is the latest chapter in a long-running dispute between the parties over the planned redevelopment of the Mall site. The Montgomery County Council approved the redevelopment in 2012, as part of a broader plan to revitalize the surrounding area, and litigation commenced soon thereafter. We have decided one appeal already in this case, *see Lord & Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211 (4th Cir. 2015) ("*White Flint I*"), and the details of the parties' original agreement and the County's zoning process are set out in that opinion.

We recap only briefly here. In 1975, White Flint, then planning the development of what would become the Mall, reached an agreement with Lord & Taylor: Lord & Taylor would lease land on the Mall site and serve as an "anchor" tenant for the Mall, along with co-anchor Bloomingdale's. And in exchange, White Flint would construct an enclosed "first class" mall and then maintain it until at least 2042. The parties' agreement required White Flint to secure Lord & Taylor's consent before building any additional structures or making alterations to the Mall's design or appearance.

The Mall opened in 1977 and operated successfully for many years, before more recently experiencing a drop in business. The parties, not surprisingly, disagree about the cause of this decline. According to White Flint, the Mall's struggles reflect the weakening of the mall business generally, as consumer preferences change and e-commerce grows; for Lord & Taylor, the blame goes to White Flint, for allowing the Mall to fail and even hastening its demise by offering tenant buy-outs, all to facilitate the redevelopment plan. Whatever the cause, in 2012, Bloomingdale's chose not to renew its lease, and by 2013, the vast majority of tenants had left the Mall.

The Mall officially closed in January 2015, leaving Lord & Taylor the sole business operating on the premises. By then, White Flint already had demolished the Bloomingdale's building, with further construction to come. Ultimately, the redevelopment plan calls for transforming what once was an enclosed mall into a mixed-use development, complete with residential, retail, recreational and office space.

**B.**

Lord & Taylor objected to the redevelopment, arguing that the clear terms of the parties' agreement required White Flint to maintain the Mall, and that the proposed mixed-use alternative would negatively affect its business by making customer access less convenient and denying the store the benefit of foot traffic from Mall customers. Negotiations between the parties proved fruitless, and Lord & Taylor filed its first complaint against White Flint in July 2013.

In that original complaint, what Lord & Taylor sought was not damages but an injunction, prohibiting White Flint from carrying out the proposed redevelopment and requiring it instead to continue operation of the Mall. The district court denied the requested relief. Assuming that White Flint had breached its contractual obligations, the district court reasoned, Lord & Taylor would be entitled to monetary damages for any harm that resulted. But injunctive relief, the district court concluded, would be infeasible under the circumstances, requiring the kind of ongoing judicial supervision of a major and complex commercial undertaking that is outside court competence. In our previous encounter with this case, we affirmed the denial of injunctive relief as well within the discretion of the district court. *See White Flint I*, 780 F.3d at 217–29.

So Lord & Taylor amended its complaint to bring the alternative claim hypothesized by the district court: one for damages resulting from White Flint's alleged breach of contract. And for good measure, Lord & Taylor added a claim for fraud, as well. According to Lord & Taylor, White Flint's breach and fraud had cost it somewhere between $70 and $100 million. Specifically, Lord & Taylor sought damages for lost

5

profits during the construction phase of the redevelopment; for the costs of redesigning and reconstructing its store to conform to the new development; and for the loss of bargained-for property rights, in the form of use restrictions and easements violated by the planned redevelopment.

Not all of Lord & Taylor's claims survived to trial. Lord & Taylor's fraud claim, for instance, alleged that the store had been misled about White Flint's plans by a letter in which White Flint assured Lord & Taylor that it did not "inten[d] to take any action or undertake any changes at the [M]all in violation of [the contract]." J.A. 598. The district court granted summary judgment to White Flint, deeming the fraud claim "utterly meritless," J.A. 603, in part because White Flint's statement of intent was not false, and in part because there was no evidence that Lord & Taylor, a "large multi-national . . . operation" with the "most sophisticated . . . people running it," had relied on or been deceived by the statement, J.A. 601–02.

The district court also rejected one of Lord & Taylor's three damages theories, under which Lord & Taylor sought to recover for lost property rights as well as lost profits. Specifically, the court granted White Flint's motion to exclude Lord & Taylor's proposed expert testimony on the value of its easements and use restrictions under the contract, explaining that the expert's data was unreliable and, in any event, that the proper measure of damages for the deprivation of such property rights is lost profits alone.

The remainder of Lord & Taylor's case went to trial, where a jury heard evidence and argument for twelve days. On the merits of its breach claim, Lord & Taylor argued

6

that the proposed redevelopment was a clear violation of its contract with White Flint, and that White Flint had hastened the Mall's decline in order to reap the rewards of redevelopment. In response, White Flint argued that any breach of contract should be excused by reason of impossibility. According to White Flint, economic trends combined with the departure of co-anchor Bloomingdale's made continued operation of the Mall impossible, and its substitute mixed-use redevelopment would be an overall economic boon to the area.

Much of the trial, however, focused on the question of damages, with Lord & Taylor presenting two distinct theories under which it sought recovery. First, Lord & Taylor claimed damages for lost profits during the demolition and construction phase of the project, when customer access would be disrupted and the store would lose the benefit of foot traffic in the area. Lord & Taylor's expert calculated lost profits of up to $31 million, on the assumption that the construction phase would last for between ten and thirteen years, starting with the alleged breach in 2012.

White Flint took issue with Lord & Taylor's calculations, and presented expert testimony of its own projecting a construction period of only three and a half years and estimating damages using a significantly lower profit margin than that employed by Lord & Taylor's expert. White Flint also insisted that any damages award should reflect not only lower profits during construction, but also the greater profits that would accrue to Lord & Taylor in subsequent years, once construction was complete and the store became part of a successful mixed-use development. The district court disagreed, holding that

7

any such future benefits were too speculative to be the basis of a damages award, and instructing the jury to that effect.

Lord & Taylor's second damages theory centered around the costs of reconfiguring its store to take account of the fact that it no longer would be part of an enclosed mall. Lord & Taylor presented testimony from Kerry Mader, a long-time store executive responsible for renovations, who explained the extensive redesign that would be required to accommodate the shift from a multi-entrance mall store to a stand-alone store, and calculated construction costs of between $30 and $36 million. White Flint did not present evidence of its own regarding construction costs or argue for a different cost estimate. But it did object to the admission of Mader's testimony, arguing that Mader was offering expert opinion without having been qualified as an expert under Rule 702 of the Federal Rules of Evidence. The district court rejected that argument, concluding that Mader was offering lay rather than expert testimony, based on Mader's own previous experience and "day-to-day work with the company," and that any shortcomings in his cost estimate should be addressed by "spirited cross-examination" of the witness. J.A. 3642–43.

After several days of jury deliberation and an agreement by the parties to accept a non-unanimous verdict, the jury found White Flint in breach of contract, rejected White Flint's defenses, and awarded Lord & Taylor $31 million in damages. The $31 million figure is consistent with both Lord & Taylor's estimate of lost profits (up to $31 million) and its estimate of construction costs (between $30 and $36 million), and the jury's general verdict form did not specify the theory on which damages were awarded.

Both parties timely appealed.

## II.

### A.

District courts have broad discretion to manage jury trials. Accordingly, we review a district court's jury instructions, evidentiary rulings, and discovery rulings for abuse of discretion only. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) (evidentiary rulings); *Coll. Loan Corp. v. SLM Corp., a Delaware Corp.*, 396 F.3d 588, 595 (4th Cir. 2005) (jury instructions); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995) (discovery rulings).

### B.

We begin with White Flint's appeal. White Flint does not challenge the jury's finding that it breached its contract with Lord & Taylor. Instead, it challenges the $31 million damages award, raising two arguments, each aimed at one of Lord & Taylor's theories of recovery. With respect to lost profits, White Flint argues that the district court erred by instructing the jury not to consider, in calculating damages, the redevelopment's potential positive impact on Lord & Taylor's profits. And with respect to renovation costs, White Flint argues that Mader's construction cost estimate was improperly admitted as lay opinion testimony. For the reasons given below, we find neither argument persuasive.

**1.**

In response to Lord & Taylor's expert testimony on lost profits, White Flint presented its own expert, Scott DeCain, to testify to the future benefits of the redevelopment project for Lord & Taylor's bottom line. DeCain acknowledged that Lord & Taylor's sales would decline during the construction period, which he estimated at three and a half years. But according to DeCain, once construction on the redevelopment was complete, Lord & Taylor's net profits would *increase* – in the amount of $10 million over five years – as a result of the "infinitely superior" new site plan, replacing an outdated enclosed mall with a more desirable mixed-use complex. J.A. 5031. And so, White Flint argued, any damages award based on lost profits should include an offset or deduction to account for these future economic benefits.

The district court disagreed. Under Maryland law, the district court explained in an oral ruling, damages must be proved with "reasonable certainty." J.A. 5337. And White Flint's evidence of future benefit to Lord & Taylor, the court concluded, was "entirely too speculative" to meet that standard. J.A. 5332. Neither the timing of the redevelopment nor its ultimate success, the court held, was established with the requisite level of certainty. *See, e.g.*, J.A. 5332 ("We don't know what delays the development is going to endure[.]"); *id.* at 5333 ("We don't know whether this will be the rage of Montgomery County or the beached whale of Montgomery County."). Accordingly, while the court allowed White Flint to argue the predicted economic upside of its redevelopment plan as a defense to Lord & Taylor's breach claim, it instructed the jury

10

not to consider "the potentially positive economic effects of the planned redevelopment" in assessing damages for lost profits. J.A. 5567.[1]

We find no abuse of discretion in the district court's determination. As the parties agree, this case is governed by Maryland law. *See White Flint I*, 780 F.3d at 215. And under Maryland law, it is clear that damages related to lost profits "may not be recovered unless they can be proved with 'reasonable certainty.'" *Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 668 (D. Md. 2000) (citing *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 907 (Md. 1978)). Complete certainty is not required, and reasonable inferences may be drawn from the evidence. *See M & R Contractors & Builders v. Michael*, 138 A.2d 350, 355 (Md. 1958). But "anticipated profits" must be shown "with reasonable certainty so that the evidence rises above speculation or conjecture." *John D. Copanos & Sons Inc. v. McDade Rigging & Steel Erection Co.*, 403 A.2d 402, 405 (Md. Ct. Spec. App. 1979).

---

[1] The relevant jury instruction reads in full:

> [White Flint] has presented evidence of its plans for redevelopment of the White Flint Mall property and the potentially positive effects of that future development on the Lord & Taylor store. I have just instructed you that damages must be proved with reasonable probability or certainty. Because of the uncertainty of the evidence associated with both the timing and future financial success of the redevelopment as well as its possible impact on the net income of the Lord & Taylor store, I instruct you that in the event that you decide to make an award of damages to the plaintiffs for lost income, you may not reduce your award because of the potentially positive economic effects of the planned redevelopment.

J.A. 5566–67.

The district court properly applied that standard and concluded that on the record before it, White Flint could not establish to a "reasonable certainty" whether and to what extent Lord & Taylor would benefit from the redevelopment.[2] We have no basis for disturbing that judgment. As the district court observed, the evidence made clear that the redevelopment remained a work in progress: "We have no idea exactly where the buildings are going to be, how many there are going to be. . . . We don't know what delays the development is going to endure . . . I don't know whether it's going to lease up overnight." J.A. 5332–33. On cross-examination, DeCain himself acknowledged that he did not know, for instance, when construction on various phases of the project would start or end, who might join the project as anchor tenants, or what other retail tenants might participate.

None of this, to be clear, is to fault DeCain or his work. A real estate development of the scale contemplated here is an inherently risky endeavor, extending years into the future and marked by significant uncertainty. Any prediction of the degree of success, no

---

[2] White Flint suggests that the district court applied a different legal standard, misreading Maryland law to prohibit *any* recovery of future profits by a new business without a financial track record. We disagree. Though the district court noted that "[t]he cases, generally speaking, reject the effort of someone to recover future profits from a business that's not operating, [and] never has operated," J.A. 5331–32, it clearly understood the ultimate question to be whether evidence of lost profits was sufficiently certain or unduly speculative, *see* J.A. 5337 ("[T]he basic notion is that damages have to be proved with reasonable certainty."); *id.* at 5566 (instructing jury that evidence of positive effects of development is too uncertain to consider in assessing damages). We see no conflict with Maryland law, which permits consideration of whether a business is new or old in determining whether anticipated profits can be shown with reasonable certainty. *See John D. Copanos & Sons, Inc.*, 403 A.2d at 404–05.

matter how sophisticated, necessarily will rest on assumptions about a long list of contingencies. At bottom, deciding when anticipated future profits from such an enterprise have been established as "reasonably certain" is a fact-intensive judgment call, within the sound discretion of a trial court. The district court did not abuse that discretion here.[3]

**2.**

Lord & Taylor separately claimed damages for the cost of reconfiguring and renovating its store to accommodate the new site plan and, in particular, the loss of several entrances that had connected it to the original Mall. To support this second theory of damages, Lord & Taylor offered the testimony of Kerry Mader, an executive of Lord & Taylor's parent company responsible for store design, store construction, and facilities, who opined that construction costs would fall between $30 and $36 million. White Flint objected, arguing that Mader's proposed testimony was expert in nature and that Mader had not been qualified as an expert under Federal Rule of Evidence 702.

The district court rejected that claim and allowed Mader to testify as a lay opinion witness under Federal Rule of Evidence 701. The court recognized that Rule 702's reliability requirements may not be circumvented by allowing unqualified expert

---

[3] In connection with its challenge to Lord & Taylor's estimate of lost profits, White Flint also appeals the district court's decision not to compel discovery of financial data and profit margins for all of Lord & Taylor's stores nationwide, limiting discovery instead to seven stores in the surrounding region. The "scope and conduct of discovery are within the sound discretion of the district court," *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 973 (4th Cir. 1979), and we perceive no reason to disturb the district court's exercise of discretion on this matter.

13

testimony in the guise of lay testimony. And the court understood that there may be a "fine line" between Rule 701 lay opinion and Rule 702 expert testimony. J.A. 3639. In this case, however, the district court concluded that because Mader's testimony was based on Mader's own experience – his "day-to-day work" as an officer of Lord & Taylor – it was admissible as lay testimony, without the necessity of qualifying Mader as an expert. J.A. 3642–43.

Again, we have no basis for disturbing the district court's judgment. It is true, as White Flint argues, that Mader was not qualified as an expert under Federal Rule of Evidence 702, which governs testimony by "expert" witnesses that is based on "scientific, technical, or other specialized knowledge." But Federal Rule of Evidence 701 permits a lay witness – with no need for expert qualification – to give opinion testimony that is "rationally based on the witness's perception" and helpful to determining a fact in issue, so long as it is not based on the same "scientific, technical, or other specialized knowledge" covered by Rule 702. And while the line between the two, as the district court recognized, can be "a fine one," *see United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006) (internal quotation marks and citation omitted), the key to Rule 701 lay opinion testimony is that it must arise from the personal knowledge or first-hand perception of the witness. *See id.* at 155–56; *MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990) (allowing lay opinion testimony under Rule 701 where it is "well founded on personal knowledge as distinguished from hypothetical facts" and based on "relevant historical or narrative facts that the witness has perceived") (internal quotation marks omitted).

We have applied that general rule to permit business employees – like Mader – to opine on accounting projections under Rule 701, so long as their opinions are based on their first-hand experience on the job. *See MCI Telecommunications*, 897 F.3d at 706 (holding that business bookkeeper may give lay opinion testimony on projected profits on the "basis of facts and data perceived by him" in his role as bookkeeper). Indeed, in an unpublished opinion that is directly relevant here, we have allowed lay testimony as to projected *construction* costs when it is based on the witness's personal experience with similar projects. *See Lake Ridge Apartments, LLC v. Bir Lakeridge, LLC*, 335 F. App'x 278 (4th Cir. 2009) (unpublished).

The district court did not abuse its discretion when it concluded that under this line of authority, Mader's testimony was admissible under Rule 701 as lay opinion testimony. With 38 years of industry experience, Mader supervises store design and construction at Lord & Taylor on a "day-to-day" basis. Drawing on personal knowledge gleaned from that on-the-job experience – including "relevant historical . . . facts" regarding the more than 50 redesign projects he has overseen, *see MCI Telecommunications*, 897 F.2d at 706 – Mader described past Lord & Taylor renovation projects, outlined the kinds of changes necessitated by the loss of mall entrances, and explained the increased construction costs customarily associated with renovations to a store that remains open for business. The district court reasonably could conclude that like the witness in *Lake Ridge Apartments*, Mader's ultimate projection of construction costs was predicated on his "previous experience," 355 Fed. App'x at 284, and "personal knowledge and perception," *see MCI*

15

*Telecommunications*, 897 F.2d at 706, rather than the kind of specialized reasoning process subject to Rule 702 as expert testimony.

We note, as did the district court, that this determination is consistent not only with our precedent but also with the Advisory Committee's Note to Rule 701. That Note recognizes that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." FED. R. EVID. 701 advisory committee's note to 2000 amendment. Such testimony, the Committee explains, is admissible under Rule 701 because it is based not on "experience, training or specialized knowledge within the realm of an expert," but on "the particularized knowledge that the witness has by virtue of his or her position in the business." *Id.* It requires nothing more than acknowledgement of an accounting identity – that the "profits" referenced in the Note equal revenue minus cost – to see that the cost estimate offered by Mader, an officer at Lord & Taylor, falls squarely under this contemplated category of permissible lay testimony. *See id.*

White Flint argues strenuously that Mader's hands-on experience is insufficient to substantiate his testimony because, for instance, Mader visited the store only once, and had never before estimated costs for a Maryland project. But those arguments go to the weight to be given Mader's testimony, not to its lay character or admissibility. The district court expressly invited robust cross-examination of Mader about any perceived deficiencies in his testimony, and White Flint obliged. It was within the province of the jury to decide whether it found Mader's testimony credible, and we will not revisit that

16

determination here. *See United States v. Burgos*, 94 F.3d 849, 868 (4th Cir. 1996) (en banc) (determining witness credibility is for factfinder, not reviewing court).[4]

## C.

We turn finally to Lord & Taylor's cross-appeal. In addition to seeking damages for lost profits and renovation costs, Lord & Taylor requested damages under a third theory, for the alleged taking of its property rights under its agreement with White Flint. Specifically, Lord & Taylor argued that it had property rights – easements and use restrictions – "separate and distinct" from its right to operate a store on the site, and that it should be separately compensated for the loss of those rights. Cross-Appellants Reply Br. at 14. The district court rejected that theory when it excluded the testimony of Lord & Taylor's property appraisal expert, William Harvey, who attempted to quantify the value of those property rights. Lord & Taylor now argues that the district court's decision was an abuse of discretion. We disagree.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts have a "gatekeeping responsibility" to "ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Nease v. Ford*

---

[4] Because we conclude that the district court did not abuse its discretion in admitting Mader's testimony under Rule 701, we need not consider Lord & Taylor's alternative argument that any error in this regard would have been harmless. We note, however, that the jury's $31 million damages award was consistent not only with Lord & Taylor's renovation-cost theory of recovery, but also with the evidence presented by Lord & Taylor regarding lost profits of up to $31 million. And the jury's general verdict form – to which White Flint did not object at the close of trial – does not specify the basis for the jury's award. With or without Mader's testimony, in other words, the jury's verdict may well be supported by sufficient evidence of lost profits.

*Motor Co.*, No. 15-1950, 2017 WL 437665, at \*6 (4th Cir. Feb. 1, 2017) (quoting *Daubert*, 509 U.S. at 597) (emphasis in original). Exercising that gatekeeping function, the district court here excluded Harvey's testimony for two independent reasons. First, the court ruled that Harvey's data was unreliable. And second, the court held that the entire premise of Harvey's valuation testimony was irrelevant, because Maryland law does not permit recovery for abridged property rights as distinct from and in addition to lost profits.

Without casting any doubt on the district court's reliability finding, we affirm on the court's second ground: Under Maryland law, "loss of profits is the governing factor" in calculating damages stemming from a violation of a restrictive use covenant. *Freedman v. Seidler*, 194 A.2d 778, 782 (Md. 1963). At least when it comes to commercial properties like Lord & Taylor, that is, where easements and use restrictions protect the income-producing capacity of the property, damages for a violation of those easements and restrictions may be measured only in terms of lost profits. *See Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*, No. CIV.A. RDB-11-1864, 2013 WL 5274356, at \*4 (D. Md. Sept. 17, 2013), *aff'd*, 594 F. App'x 798 (4th Cir. 2014) (applying Maryland law). Allowing a commercial plaintiff to recover for lost damages and also for abridged property rights would amount to a double recovery – or, in the apt phrase of the district court, to "getting six or more pieces of pie out of a four-piece pie." J.A. 2287. The district court committed no legal error or other abuse of discretion in applying long-

18

established Maryland law to reject Lord & Taylor's claim to separate damages for the taking of property rights.[5]

## III.

For the foregoing reasons, we affirm in full the judgment of the district court.

*AFFIRMED*

---

[5] Construed generously, Lord & Taylor's opening brief may be understood also to challenge the grant of summary judgment against Lord & Taylor on its fraud claim. Reviewing the record in the light most favorable to Lord & Taylor, we affirm for the reasons given by the district court. *See supra* at 598–604.