**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1316**

───────────

MALCOLM WIENER,

      Plaintiff – Appellant,

  v.

AXA EQUITABLE LIFE INSURANCE COMPANY,

      Defendant – Appellee.

───────────

Appeal from the United States District Court for the Western District of North Carolina at Charlotte. Robert J. Conrad, Jr., District Judge. (3:18-cv-00106-RJC-DSC)

───────────

Argued: December 11, 2024             Decided: September 3, 2025

───────────

Before WILKINSON, GREGORY, and RICHARDSON, Circuit Judges.

───────────

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

───────────

**ARGUED:** Ross Fulton, RAYBURN, COOPER & DURHAM, PA, Charlotte, North Carolina, for Appellant. Matthew Woodruff Sawchak, ROBINSON, BRADSHAW & HINSON, P.A., Raleigh, North Carolina, for Appellee. **ON BRIEF:** Carolyn T. Seely, Greenwich, Connecticut; David G. Webbert, JOHNSON & WEBBERT, LLP, Topsham, Maine; Richard H. Fallon, Jr., Cambridge, Massachusetts, for Appellant. John R. Wester, Stephen D. Feldman, Erik R. Zimmerman, ROBINSON, BRADSHAW & HINSON, P.A., Raleigh, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

This is the second time this case has come before us on appeal.  The first time, the parties disputed, among other things, whether there was sufficient evidence for a jury to find AXA liable for causing Malcolm Wiener's inability to find a life insurance policy. We held that there was but remanded to have the district court determine whether the jury had sufficient evidence to calculate the amount of Wiener's damages.  The district court found the evidence lacking.  We affirm.

I.    BACKGROUND

A portion of the events underlying this appeal have already been given in our first panel opinion. *See Wiener v. AXA Equitable Life Ins.*, 58 F.4th 774, 777–79 (4th Cir. 2023) (*Wiener I*).  For clarity, we recap from the beginning.

Malcolm Wiener purchased $16 million in permanent life insurance[1] from AXA Equitable Life Insurance in the 1980s.  All was uneventful until 2013, when Wiener failed to pay premiums on time and his policy lapsed.[2]  Seeking to reinstate his policy, he authorized AXA to access his medical records for its reinstatement assessment.  In 2014, Hallie Hodgins, an AXA underwriter, assessed Wiener's health on the basis of his medical

---

[1] As the parties explain, there are two types of life insurance:  term and permanent. Term life insurance covers a period of time and functions like car insurance.  If the insuree does not die within that period of time, the coverage ends with no payout on the policy. By contrast, permanent life insurance covers an insuree until their death, guaranteeing a payout on the policy.  Due to the guaranteed payout, the premiums for permanent life insurance are much higher.

[2] Technically, Wiener purchased three life insurance policies that added up to a $16 million death benefit.  We refer to the three policies in the aggregate as a single policy for simplicity.

2

records and denied his application after determining he had four serious medical conditions. This determination was erroneous. AXA then spread its error by submitting diagnosis codes representing his nonexistent medical conditions to the Medical Information Bureau ("MIB"), a private not-for-profit consortium of about 400 insurance companies that collectively underwrite 90–95% of life insurance in the United States. Any MIB member who checked Wiener's MIB file would see the nonexistent medical conditions in his file.

Rejected by AXA, Wiener asked his insurance agent, Sanford Robbins, to apply for a $16 million life insurance policy at other insurers. All but two insurers rejected Wiener's application outright. The remaining two made preliminary offers "for a $10 million policy at double the standard rate—which would have cost Wiener an extra $400,000 per year." *Wiener I*, 58 F.4th at 785. Later, several representatives from the other insurers testified that the false MIB codes in Wiener's file adversely affected his application.

Wiener responded by initiating two separate and distinct sets of lawsuits against AXA. Ours is only the second, but it will help to understand the contours of both.

First, in 2015, Wiener sued AXA in Connecticut state court. The suit was then removed to federal court and transferred to the Southern District of New York. *See Wiener v. AXA Equitable Life Ins.*, 2021 WL 1226925, at *3 (S.D.N.Y. Mar. 31, 2021). In that suit, Wiener asserted claims against AXA for (1) terminating his original policy, and for (2) failing to approve his reinstatement application. *Id.* The district court granted summary judgment to AXA on all claims. *Id.* at *23. The Second Circuit recently upheld the grant of summary judgment as to the former "Termination Claims," but vacated and remanded

on the latter "Reinstatement Claim." *Wiener v. AXA Equitable Life Ins.*, 113 F.4th 201, 206 (2d Cir. 2024). The post-remand proceedings in the Southern District of New York are still ongoing.

Second, in 2018, Wiener sued AXA in North Carolina state court. The suit was removed to the Western District of North Carolina—the district court below. Here, Wiener asserted a wholly distinct claim of negligence: that AXA "communicated false information" to MIB through false MIB codes and thereby "rendered [him] uninsurable." J.A. 38–40; *see also* J.A. 37 ("Defendant's false report and misrepresentations to MIB prevents Plaintiff from obtaining life insurance from other companies and renders him uninsurable."); J.A. 41 ("The MIB report . . . is the proximate and actual cause of Plaintiff's uninsurability.").

The second case proceeded to a jury trial in September 2020. Wiener had three main sources of evidence for his uninsurability negligence claim: (1) the direct examination of AXA underwriter Hodgins, who was grilled about her read of Wiener's medical record and MIB codes; (2) a deposition from Robbins elaborating on his failed attempts to procure replacement life insurance for Wiener at the standard rate; and (3) expert testimony from Stephen Burgess, an insurance sales manager, explaining how MIB codes are used by insurance companies.

After the close of Wiener's case, AXA moved for a directed verdict under Rule 50(a). In its motion, AXA argued that Wiener had not produced sufficient evidence that he suffered the injury of uninsurability, or that the MIB codes caused such an injury. AXA also argued that the amount requested by Wiener in damages—the $16 million face value

4

of the sought-after insurance policy—"makes no logical sense whatsoever." J.A. 1164. The district court denied the motion.

At the end of the trial, the jury found AXA liable for negligence and determined that Wiener had suffered $16 million in damages. The jury awarded only $8 million after finding that Wiener had failed to mitigate his losses. As is normal, no explanation was given by the jury as to how it calculated either the amount of actual damages or the mitigation reduction.

AXA filed for post-trial relief under Rule 50(b), reasserting, among others, the arguments it had raised in its earlier Rule 50(a) motion: that the jury lacked sufficient evidence to hold AXA liable for negligence, and that the jury lacked sufficient evidence to calculate $16 million in damages. AXA alternatively requested a new trial under Rule 59.

Rather than ruling on AXA's post-trial motions, the district court determined that it lacked subject matter jurisdiction and dismissed the case. *Wiener v. AXA Equitable Life Ins.*, 2021 WL 665112, at *7 (W.D.N.C. Feb. 19, 2021). Wiener appealed the dismissal. AXA defended the district court's jurisdictional determination and, in the alternative, urged us to affirm the district court's dismissal for the sufficiency-of-the-evidence arguments made in its Rule 50(b) motion.

We overturned the jurisdictional decision on appeal. *See Wiener I*, 58 F.4th at 782. We also rejected AXA's alternative argument and concluded that the jury had sufficient evidence to find all elements of negligence, including causation. *Id.* at 784–85. But we remanded to the district court to determine whether the jury had sufficient evidence to calculate damages as it did.

5

On remand, the district court granted AXA's post-trial 50(b) motion as to the damages award. It held that Wiener had "offered no baseline to support the jury's $16 million award," clarifying that the $16 million face-value of the old policy's death benefit was an "improper standard" to calculate damages on Wiener's theory of injury. *Wiener v. AXA Equitable Life Ins.*, 2024 WL 1024744, at \*3–4 (W.D.N.C. Mar. 8, 2024). For the jury to calculate damages, the district court believed Wiener needed to offer evidence that "he would have even qualified for $16 million in life insurance" at the time he sought a new policy. *Id.* at \*4. "Without appropriate evidence of Wiener's insurability, actual damages based on a lapsed $16 million death benefit are purely contingent." *Id.* at \*5 (quotation omitted). It thus reduced Wiener's damages award to $1 in nominal damages. *Id.*

The district court also conditionally granted AXA's Rule 59 motion for a new trial in case its 50(b) order was vacated or reversed. *Id.* at \*6. It reasoned that even construing all the facts in Wiener's favor, the damages award "is against the clear weight of the evidence" and thus AXA would deserve a new trial at worst. *Id.*

Wiener timely appealed.

## II.    DISCUSSION

The question before us is narrow. In *Wiener I*, we upheld the jury's determination that AXA's negligence caused Wiener to become "effectively uninsurable or uninsurable at a reasonable cost," and that, in the absence of AXA's erroneous MIB codes, Wiener would have been able to find insurance at a "reasonable price." *Wiener I*, 58 F.4th at 784–

6

85. These determinations bind us as the law of the case. *See Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 68–69 (4th Cir. 1988).

With AXA's liability settled, the sole question on appeal is whether the jury had sufficient evidence to determine that Wiener suffered $16 million in damages. We agree with the district court that it did not, reviewing the sufficiency-of-the-evidence challenge *de novo*. *See Wiener I*, 58 F.4th at 784. And because we determine that the district court properly granted AXA's Rule 50(b) motion, we do not address the district court's conditional grant of a new trial under Rule 59.

## A.    The Jury Lacked Sufficient Evidence To Calculate Damages

When conducting a sufficiency-of-the-evidence inquiry for a post-trial Rule 50(b) motion we do not "weigh the plaintiff's evidence against that offered by the defendant." *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 298 (4th Cir. 1984). Instead, we take the evidence in the most favorable light to the party opposing the motion and ask whether a reasonable jury could have arrived at its conclusion. *See id.*; *see also Musacchio v. United States*, 577 U.S. 237, 243 (2016) (clarifying in the context of a criminal case that sufficiency-of-the-evidence review "does not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences") (quotation omitted).

Additionally, because damages awards are governed by state law when a federal court sits in diversity, we look to North Carolina law to see what is required for a jury to award damages. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430–31 (1996); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78–79 (1938); *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 573–74 (4th Cir. 2017); *see also Wiener I*, 58 F.4th at 781–82 (holding

7

that North Carolina law applies to this case).  Under North Carolina law, "proof of damages must be made with reasonable certainty."  *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 356 S.E.2d 578, 585 (N.C. 1987).  Reasonable certainty requires that the record contain evidence that is "sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion."  *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 234 S.E.2d 605, 607 (N.C. 1977) (quoting *Perfecting Serv. Co. v. Prod. Dev. & Sales Co.*, 131 S.E.2d 9, 22 (N.C. 1963)).  Although "[a]bsolute certainty is not required," damages "may not be awarded where the evidence permits no more than speculation."  *Id.*

Layering the federal Rule 50(b) standard atop North Carolina's damages standard, we ask whether there was enough evidence that, when construed in the light most favorable to Wiener, was specific and complete enough to allow the jury to arrive at a reasonable conclusion about the amount of damages to award.

The evidence falls short.  The key to seeing why is understanding the injury the jury's damages award is meant to remedy.  The injury, as we stated in our prior opinion, is that Wiener could not "obtain insurance at a reasonable price" because AXA's erroneous MIB codes "prevent[ed] carriers from issuing a policy at the standard rate."  *Wiener I*, 58 F.4th at 784–85.  In other words, Wiener would have had to pay *increased premiums over the rest of his life* to receive the same permanent life insurance coverage through death.  To calculate this value, the jury needed at least two data points:  (1) the additional premiums Wiener would need to pay per year for a $16 million permanent life insurance policy, and (2) the number of years Wiener was expected to live after 2014, when AXA entered

8

erroneous MIB codes and caused his injury. Multiplying the two numbers together would give the total expected damages from AXA's negligence.[3]

Wiener's evidence only gets him halfway there. We find sufficient evidence in the record to permit a jury to determine the first data point, Wiener's additional annual premiums. Robbins explained that he was only able to secure two preliminary offers of insurance, and they were offers at double the standard rate, which would have cost Wiener an extra $400,000 per year per 10 million in death benefit coverage. J.A. 929.[4] A jury could multiply the annual $400,000 additional cost for $10 million in benefits by 1.6 to reflect $16 million in benefits and conclude that AXA's negligence would force Wiener to pay an additional $400,000 * 1.6 = $640,000 a year in additional premiums.

AXA argues that we cannot assume that Wiener could have obtained a policy at the standard rate in the absence of erroneous MIB codes. According to AXA, Robbins testified that the standard rate was the rate that a typical person would obtain if they were healthy,

---

[3] The jury would potentially also need to discount for the time value of money. *Cf. Jackson v. City of Cookeville*, 31 F.3d 1354, 1360–61 (6th Cir. 1994) ("An economically accurate measure of Jackson's lost future income would . . . [be] discounted to present value through the use of an appropriate discount rate, which represents the value of having the money now rather than later."). Because the jury lacked a far more fundamental piece of information, we do not address the necessity of time discounting.

[4] Wiener filed Volume III of the Joint Appendix under seal. Though we granted that request, we cannot now identify any basis for sealing, particularly since much of the material is unsealed on the district court's docket. Given the heavy burden to seal judicial records, *see, e.g.*, *United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 171 (4th Cir. 2024), we direct the unredacted briefing and Volume III of the Joint Appendix be unsealed ten days after this opinion is issued. If a valid justification exists for sealing some portion of the sealed materials, then we invite the parties to file a motion addressing the issue within the ten-day period.

and Wiener failed to offer evidence "that insurers would consider Mr. Wiener typical or healthy." Resp. Br. at 36. Whatever its merits, AXA's argument is foreclosed by the law of the case. Our prior opinion already established that there was sufficient evidence for the jury to conclude that AXA's negligence "prevent[ed] carriers from issuing a policy at the standard rate," which caused Wiener to "become effectively uninsurable or uninsurable at a reasonable cost." *Wiener I*, 58 F.4th at 785. This conclusion rests on an assumption that Wiener was otherwise insurable at the standard rate. The time to contest that assumption has passed. So we accept that the jury could have calculated Wiener's increased annual premiums from Robbins' testimony.

But the second data point, Wiener's expected remaining lifespan in 2014, is a different story. Wiener argues that two pieces of evidence could permit a jury to ascertain his remaining lifespan with reasonable certainty. First, the jury could have observed the then-85-year-old Wiener on a video call in 2020 and estimated his remaining lifespan from his general demeanor. Second, Wiener's longtime physician, Dr. Barry Boyd, testified at trial that Wiener was healthy for his age. From these two pieces of evidence, Wiener argues that "a reasonable jury could easily have estimated that Mr. Wiener would live for about another six years beyond the six and a half years that had already elapsed since 2014." Op. Br. at 30.

10

Even if we accept these fragments of evidence from 2020 as probative of Wiener's expected remaining lifespan in 2014, they are insufficient.[5]  Contrary to Wiener's assertion, we fail to see how the jury could have "easily estimated" his lifespan simply by looking at him—over a video call, no less.  Such a talent seems reserved for seers and oracles.  Nor do Dr. Boyd's remarks at trial move the needle.  Dr. Boyd merely commented in passing that Wiener was doing well and that his chronic illnesses were being adequately managed with medication.  These general descriptions of Wiener's health, even when paired with his demeanor, fall far short of the sort of specific medical—or actuarial—evidence that a layperson would need to calculate Wiener's lifespan with reasonable certainty.

Indeed, the North Carolina courts have rejected damages awards from juries that had more medical information than the jury did here.  In *Short v. Chapman*, 136 S.E.2d 40 (N.C. 1964), the North Carolina Supreme Court considered a challenge to a jury award of damages for the defendant's injuries in a car accident caused by the plaintiff's negligence.[6]  Despite medical expert testimony on the status of the defendant's leg at the time of the accident and the extent of her treatment afterward, the North Carolina Supreme Court held that the jury's award of damages could not be sustained.  *Id.* at 48.  Because the defendant adduced no expert testimony *specifically* on the expected future duration or permanence of

---

[5] Because the relevant data point is his expected lifespan in 2014—the time of his asserted injury—his health and demeanor at trial in 2020 are not particularly relevant.

[6] The defendant counterclaimed for injuries in the suit brought by the plaintiff, hence the grant of damages for the defendant. *Short*, 136 S.E.2d at 42.

11

her injuries, any damages awarded to compensate the defendant's future suffering were held to be "in the realm of conjecture and speculation." *Id.*

We see no reason why the jury's conclusions here would be any different. Just as the defendant in *Short* needed to put forth evidence directly establishing the expected duration of her injuries, Wiener needed to put forth evidence directly establishing his expected remaining lifespan. Because he did not, the jury here, "being laymen[,] should not be permitted to speculate how long, in their opinion, they think [Wiener's life] will continue in the future." *Id.* (citation omitted); *see also Brown v. Neal*, 197 S.E.2d 505, 511–12 (N.C. 1973) (same).

Without any way to determine Wiener's expected lifespan, the jury could not calculate the damages he suffered from AXA's negligence with reasonable certainty.[7] The

---

[7] We have focused on the increased premiums as the measure of Wiener's damages. But there are potentially other ways to understand the injury of uninsurability. The most natural way to value the harm to somebody who is denied a financial opportunity is to figure out how much that person stood to gain financially. But that doesn't work here, because individuals do not buy insurance to make money. After all, for an insurance company to stay in business, its insurance policies must collect more in premiums (including their time value) than they pay out. So the expected net present value of any insurance policy to a policyholder is presumably negative—he is expected to lose money over the long haul. To provide any reasonable certainty about the net present value of a policy, Wiener would have to show that the death benefit exceeded the product of (1) yearly premiums and (2) the number of years Wiener was expected to live after 2014. For the reasons already discussed, Wiener failed to provide evidence from which a jury could determine his expected remaining lifespan in 2014. So this damages theory fails too.

Having failed to show damages from life insurance as a money-making investment, one more possibility exists. The typical life insurance policy can be understood as a product that reallocates financial risk, and the insuree pays for that risk reallocation as a service. The service gives the insuree peace of mind when planning his family's financial security, shielding against the catastrophic outcome of an early death. In this way, an insuree pays for insurance as he would pay for any other service, like an oil change or a
(Continued)

12

district court arrived at the same conclusion. *See Wiener*, 2024 WL 1024744, at \*4. Though it did so by a slightly different path, "we are entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *United States v. Castro-Aleman*, 141 F.4th 576, 581 (4th Cir. 2025) (cleaned up) (quoting *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003)). And when a party establishes causation and injury without proving damages to a reasonable certainty, nominal damages are the appropriate remedy. *See Lieb v. Mayer*, 94 S.E.2d 658, 659–60 (N.C. 1956) (explaining that nominal damages are appropriate when the plaintiff's "evidence fails to show adequate facts upon which a substantial recovery for damages . . . can be based"). So we affirm.

### B.    Wiener's Counterarguments Fail

Wiener attempts to undercut the above conclusion in three ways. First, he argues that AXA can only make the same arguments on appeal that it made in its Rule 50(b) motion and has thus waived any challenge to the evidence of Wiener's life expectancy. Second, Wiener argues that the jury only needed sufficient evidence to calculate his bottom-line $8 million damages award, not the top-line $16 million before reduction for Wiener's failure to mitigate. Third, Wiener argues that even if the damage figure is $16

---

haircut. And the injury suffered from the inability to buy insurance might be calculated as the cost of replacing that risk reallocation service by other means. The damages from being shut out of the life insurance market under this theory might be the estimated cost of reproducing a package of financial products that mimics the payout-upon-death structure of a life insurance policy, just as the damages from being shut out from all oil change facilities might be the estimated cost of buying a car jack, a drain pan, and some oil. But neither party has advanced a risk-reallocation understanding of damages, and no evidence was produced to support it below.

million, the $16 million death benefit of his hoped-for replacement policy is a reasonable measure of damages that the jury could have accounted for. Each of these three contentions falls short.

Wiener is correct that the losing party in a federal suit may only mount a sufficiency-of-the-evidence appeal to a jury verdict after first doing so in a Rule 50(b) motion before the district court. *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–01 (2006). Wiener is also correct that we generally do not consider issues on appeal that were not raised below. *See Brown v. Stapleton*, 142 F.4th 252, 255 n.4 (4th Cir. 2025). But AXA *did* raise the sufficiency-of-the-evidence issue with the jury's damages award in its Rule 50(b) motion.

Though AXA's arguments on appeal differ slightly from those in its motion, AXA need not align its arguments perfectly. A party preserves its challenges to an issue on appeal "even if it has pursued various and shifting theories to support its objection." *Monsalvo v. Bondi*, 145 S. Ct. 1232, 1241 n.1 (2025). In any case, AXA specifically questioned the possibility of calculating Wiener's life expectancy in its Rule 50(b) motion: "Mr. Wiener's damages required expert testimony on . . . the duration of premium payments that Mr. Wiener would pay, in view of his actuarially predicted lifespan." J.A. 612. So AXA has not waived its sufficiency-of-the-evidence challenge.

Nor would it help if we took Wiener's damages to be the bottom-line figure of $8 million after reduction for Wiener's failure to mitigate instead of the top-line pre-reduction figure of $16 million. Wiener contends that a jury could more reasonably come to the lower number. But our reasoning for why the jury lacked sufficient evidence does not rest

14

on the amount of damages awarded. Rather, the problem is that the jury had no evidence of Wiener's expected remaining lifespan. Without that crucial data point, any award of damages—whether $8 million or $16 million—could not have been "made with reasonable certainty." *Olivetti Corp.*, 356 S.E.2d at 585.[8]

And finally, Wiener is mistaken in thinking that the jury could have used the death benefit of his hoped-for replacement policy as a reasonable starting point for his damages. That simply confuses what the asserted injury is in this case. Wiener has alleged that he is now unable to find life insurance at a reasonable price due to AXA's entry of erroneous MIB codes. His injury is the increased cost to get the same death benefit—the difference between the reasonable premiums he would have paid in the absence of the erroneous MIB codes and the premiums he must pay due to AXA's negligence.

An insurance termination case—such as Wiener's suit in the Southern District of New York—is different. The damages from the termination of a past insurance policy naturally turn in part on the value of that past policy; the loss depends on what was lost.

---

[8] In any event, Wiener is wrong. The verdict form submitted by the jury shows that the damages were awarded in a two-step process: first, calculate the actual damages incurred by Wiener from his uninsurability; second, calculate how much of the actual damages Wiener should ultimately receive after reducing for his failure to mitigate. And the district court clarified in its jury instructions that the top-line number was to be the actual damages suffered by Wiener. So we understand the jury to have determined the actual damages suffered by Wiener from AXA's negligence to be the top-line figure of $16 million, not the bottom-line figure of $8 million. Wiener cites several cases in support of the idea that a court should not "worry about the mental process that led" to a jury's damages verdict but should instead focus on the "bottom line." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *see* Rep. Br. at 2–3. But we aren't left to guess at the jury's thought process—the jury explicitly stated what it thought the actual damages were. And that $16 million figure is unsupported by the evidence.

15

That is why the three cases that Wiener himself cites where the death benefit of the life insurance policy is relevant are cases where the alleged injury is termination—not the inability to find a new policy. *See Wiggins v. N. Am. Equitable Life Assurance*, 644 F.2d 1014, 1017 (4th Cir. 1981); *Garland v. Jefferson Standard Life Ins.*, 101 S.E. 616, 618–19 (N.C. 1919); *Anderson v. Wilco Life Ins.*, 943 F.3d 917, 925–26 (11th Cir. 2019). But that case is not this case. That asserted injury is not this asserted injury. Whether or not Wiener can prove up his damages in New York, he didn't here.

*         *         *

In the first appeal, we affirmed the jury's determination that AXA was liable for negligence. But we did not decide whether the evidence supported the jury's damages award. We now answer that question in the negative. The jury was not given sufficient evidence to determine Wiener's expected remaining lifespan. And without that data point, the jury could not calculate Wiener's damages with reasonable certainty. So "there can be no recovery of substantial damages." *Short*, 136 S.E.2d at 46. That leaves Wiener to recover nominal damages of $1. Accordingly, the district court's grant of AXA's Rule 50(b) motion is

*AFFIRMED.*

16